#21864-a-DG

**2006 SD 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

  v.

ELIJAH PAGE,                                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE WARREN G. JOHNSON
Judge
* * * *

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
Assistant Attorney General
CRAIG M. EICHSTADT
Deputy  Attorney General
SHERRI SUNDEM WALD
GRANT GORMLEY
Assistant Attorneys General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

JOHN R. MURPHY
Rapid City, South Dakota
and
MICHAEL J. BUTLER
Butler Law Office, P.C.
Sioux Falls, South Dakota               Attorneys for defendant
                                        and appellant.

* * * *

ARGUED MARCH 24, 2004

OPINION FILED **01/04/06**

#21864

Introduction..................................................................................................... ¶ 1

Facts and Procedure.................................................................................. ¶ 2 - ¶ 11

Analysis and Decision
   1.  Recusal of circuit judge................................................................. ¶ 12 - ¶ 18
   2.  Sufficiency of statute limiting class of persons eligible for death penalty. ¶ 19 - ¶ 22
   3.  Use of vague and overbroad aggravating factor......................................... ¶ 23 - ¶ 28
   4.  Sufficiency of evidence on aggravating factors............................................ ¶ 29 - ¶ 45
   5.  Denial of individualized sentencing hearing ............................................... ¶ 46 - ¶ 52
   6.  Selective & unconstitutional application of sentencing procedure.............. ¶ 53 - ¶ 54
   7.  Proportionality of death sentence to similar cases.................................... ¶ 55 - ¶ 65
   8.  Failure of indictment to allege any aggravating circumstances ................. ¶ 66 - ¶ 67
   9.  Capital sentencing scheme violates right to jury trial................................ ¶ 68 - ¶ 91
   10. Proportionality of sentence to co-defendant Hoadley's sentence ............... ¶ 92 - ¶122

Dissenting Opinion, Sabers, J. ........................................................................ ¶123
   1.  Capital sentencing scheme violates right to jury trial.............................¶124 - ¶137
   2.  Proportionality of sentence to co-defendant Hoadley's sentence..............¶138 - ¶144

GILBERTSON, Chief Justice.

[¶1.] On March 12-13, 2000, Elijah Page (Page) along with two other individuals, kidnapped and murdered Chester Allan Poage (Poage) in Spearfish, South Dakota. Page eventually pleaded guilty to first degree murder, kidnapping, robbery in the first degree, burglary in the first degree, and grand theft. After Page waived his right to a jury trial, and sentencing by jury, a sentencing hearing was held before the circuit court. The circuit court sentenced Page to death by lethal injection on the murder charge. Page now appeals and raises several issues for our review. We affirm on all issues.

**FACTS AND PROCEDURE**

[¶2.] On March 12, 2000, Page met up with Briley Piper (Piper), Darrell Hoadley (Hoadley), and Poage at Poage's house to play video games. Poage's mother and sister, who also lived at the house, were on vacation in Florida at this time. Eventually, Piper, Page, and Hoadley convinced Poage to leave the house,

#21864

and the four left in Poage's Chevrolet Blazer, traveling to the house where Piper, Page, and Hoadley had been staying.

[¶3.] Shortly after arriving at their destination, Page exposed a .22 caliber pistol, ordered Poage to the floor, and told the victim, "We are jacking you of all your stuff."[1] Once Poage was on the floor, Piper knocked him unconscious by kicking him in the head. While Poage was unconscious, he was tied up with a cord and sat upright in a chair. When the victim regained consciousness, he started to cry and pleaded with the group to let him go. In response, the group forced Poage to drink a concoction of crushed pills, beer, and hydrochloric acid. Page asked Poage for the personal identification number for his ATM card at this time, and the victim complied. Page and Piper then openly discussed their plan to kill Poage, including slitting his throat, but decided against this particular plan because it would get too much blood in the house. This discussion concerning the "best" way to kill Poage was carried on directly in front of the victim.[2]

[¶4.] After forcing Poage into his own vehicle, the group drove approximately seven miles to a remote, wooded area in the Black Hills known as Higgins Gulch. Once at Higgins Gulch, Poage was forced out of the vehicle into a

---

1. Page had stolen the antique .22 caliber pistol from Poage's mother's closet.

2. Testimony as to the origin of the plot to kill Poage varied. It is unclear whether all three of the assailants planned on stealing items in the house so they could buy drugs, or whether Piper pulled Page outside to inform him he was going to steal stereo equipment from Poage's vehicle. It is also unclear whether they initially planned to kill Poage, or just beat him. However, it is clear that the initial discussions as to killing Poage were limited to Piper and Page, and only after it was decided to kill him was Hoadley informed of the plan.

foot of snow. Page and Piper stripped Poage naked except for his undershirt, shoes, and socks. The temperature that night was only about twenty-five degrees Fahrenheit. Piper, Page, and Hoadley then took Poage's wallet.

[¶5.] Next, the men forced Poage to walk downhill toward a small creek. On the way to the creek, the three ordered Poage to lie down in the deep snow. At that point, Piper, Page, and Hoadley kicked snow all over the victim's exposed body. When Poage attempted to escape to save his life, Page ran him down, recaptured him, and pushed him into the icy creek. The group then began beating Poage, with Page repeatedly kicking the victim in the head. Poage cried out in pain throughout the beating, but his screams only caused more kicks. Page later admitted to kicking Poage in the head so often with his boots that it "made his own foot sore."

[¶6.] Sometime after beating Poage in the river, the group decided it was time to finally kill the victim. Page was the first to stab Poage. As he lay in the freezing water, Page took Poage's head in his arms. When Poage asked him, "What are you doing?" Page responded, "Just sit there." Page then plunged his knife all the way into the victim's neck. Piper proceeded to stab Poage in the head. During this time, Piper laughed and made jokes about the pain Poage was experiencing, to which Page "chuckled."

[¶7.] Bleeding badly from his wounds, Poage asked the three to be allowed back into his vehicle to warm himself. Testimony indicated that Poage said he preferred to bleed to death in the warmth rather than in the cold. Piper told Poage he could warm up in the vehicle if he first washed the blood off himself. Poage proceeded to rinse himself off in the icy water, but as he crawled uphill toward the vehicle, Page told him they were lying and he would not be allowed into the vehicle.

Page kicked the victim in the face once again. Poage was then dragged back into the creek. Approximately four hours after the ordeal began, and about three hours after the beatings started in the gulch, Page stated Hoadley and he finally ended Poage's life by dropping several heavy rocks on his head.

[¶8.] Piper, Page, and Hoadley drove away from the secluded area in Poage's vehicle. The group returned to the victim's house and stole several items. For his share of the victim's property, Page claimed a stereo system, clothes, and Poage's vehicle. The group then traveled to Hannibal, Missouri, to visit Piper's sister. Piper's sister refused to let them stay, however, so the three headed back to South Dakota, pawning Poage's property along the way.[3] Upon returning to South Dakota, Piper, Page, and Hoadley each went his own way.

[¶9.] On April 22, 2000, almost a month later, a woman discovered a partially submerged body in Higgins Gulch. A forensic pathologist later identified the remains as Poage. Showing signs of head injuries and stab wounds, the mostly naked body was clad only in an undershirt, shoes, and socks. Following an autopsy, the forensic pathologist ultimately determined Poage had died from "stab wounds and the blunt force injury to the head."

[¶10.] On April 25, 2000, law enforcement authorities conducted an interview with Hoadley wherein he gave a statement detailing his involvement in the murder of Poage. Based on this interview, warrants were issued for both Piper and Page.

---

3. Some of Poage's property was later found at pawnshops in Wyoming and Missouri. In addition, records from Poage's bank showed that his stolen ATM card was used six times in various locations in South Dakota and Nebraska.

Three days later, authorities located and arrested Page in Texas. The next day, Page voluntarily described to law enforcement the details surrounding Poage's murder. Page was then extradited from Texas and jailed in Lawrence County, South Dakota. Page later pleaded guilty to and was convicted of first degree felony murder, kidnapping, first degree robbery, first degree burglary, and grand theft. The State did not offer a plea agreement to Page. Page waived his rights to both a jury trial and sentencing by jury and instead requested sentencing by the circuit court. At the conclusion of a five-day sentencing hearing, the circuit court sentenced Page to death by lethal injection, finding that the State proved beyond a reasonable doubt the following aggravating factors: (1) the defendant committed the offense for the benefit of the defendant or another for the purpose of receiving money or any other item of monetary value; (2) the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim; (3) the offense was committed for the purpose of avoiding, interfering with, or preventing lawful arrest, or custody in a place of lawful confinement, of the defendant or another.[4]

[¶11.] On March 14, 2001, Page appealed his sentence to this Court. In light of a jury's subsequent imposition of life without the possibility of parole on co-defendant Hoadley, we remanded the case to the circuit court for a proportionality

---

4. The same circuit judge presided over the Hoadley trial. Well experienced in capital cases, the circuit judge previously sat with this Court by designation in *State v. Moeller*, 1996 SD 60, 548 NW2d 465 (*Moeller I*); *State v. Moeller*, 2000 SD 122, 616 NW2d 424 (*Moeller II*); and *State v. Rhines*, 1996 SD 55, 548 NW2d 415 (*Rhines I*).

review. After conducting an intra-case proportionality review, the circuit court entered findings of fact and conclusions of law affirming Page's death sentence. Page now appeals and raises the following issues for our review:

1.     Whether the circuit judge should have recused himself from sentencing Page after it imposed the death penalty on co-defendant Piper.

2.     Whether SDCL 23A-27A-1 fails to sufficiently limit the class of persons who may be deemed eligible for the death penalty.

3.     Whether the circuit court utilized a vague and overbroad aggravating factor when it determined that Page was eligible for the death penalty.

4.     Whether there was insufficient evidence in the record from which the circuit court could have reasonably determined that the State met its burden of proving the aggravating factors defined in SDCL 23A-27A-1(3), (6), and (9).

5.     Whether the circuit court deprived Page of an individualized sentencing hearing in violation of the Eighth and Fourteenth Amendments.

6.     Whether the selective application of South Dakota's mandatory capital sentencing procedures is unconstitutional.

7.     Whether Page's death sentence was grossly disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

8.     Whether Page's death sentence was unconstitutionally imposed when the indictment failed to allege any aggravating circumstances.

9.     Whether Page's death sentence was unconstitutionally imposed when SDCL 23A-27A-6 failed to allow a jury determination of the appropriate penalty upon a plea of guilty to the circuit court.

10.    Whether Page's death sentence was grossly disproportionate to co-defendant Hoadley's life sentence.

**ANALYSIS AND DECISION**

[¶12.]     **1.     Whether the circuit judge should have recused himself from sentencing Page after it imposed the death penalty on co-defendant Piper.**

[¶13.]     For his first point of error, Page argues that the circuit judge should have recused himself from sentencing him after imposing the death penalty on his co-defendant Piper.  Page believes the circuit judge developed empathy and/or sympathy for the victim through sentencing Piper, and he asserts that these feelings compromised the judge's ability to sentence him in an objective and neutral manner.  The State argues Page waived his right to disqualify the circuit judge, or in the alternative that it was not error for the circuit judge to sentence Page after sentencing Piper, given the amount of discretion normally afforded a judge's decision to preside over a case.

[¶14.]     We have consistently recognized that a defendant's "opportunity to disqualify a judge is statutory, ... and not a constitutional right, except as it may be implicit in a right to a fair trial."  State v. Hoadley, 2002 SD 109, ¶32, 651 NW2d 249, 257 (quoting State v. Goodroad, 1997 SD 46, ¶25, 563 NW2d 126, 132 (citation omitted)).  Pursuant to SDCL 15-12-21, a defendant has the right to file an affidavit seeking a change of judge.[5]  SDCL 15-12-24, however, provides:

---

5.     SDCL 15-12-21 provides:
       Except where the right is waived or is denied by this chapter, an affidavit for change of a judge or magistrate may be filed in any action pending in the court whether originating therein or pending upon appeal from an inferior court or tribunal to the circuit court.  No affidavit for such change may be filed in a criminal action prior to the completion of the preliminary hearing or waiver thereof, in any

                                                            (continued . . .)

> The submission to a judge or magistrate of argument or proof in support of a motion or application, or upon trial, is a waiver of the right thereafter to file an affidavit for change of such judge or magistrate by any party or his counsel who submitted the same or who after notice that such matter was to be presented, failed to appear at the hearing or trial. Such waiver shall continue until the final determination of the action and includes all subsequent motions, hearings, proceedings, trials, new trials, and all proceedings to enforce, amend or vacate any order or judgment.

In this case, Page submitted a plea of guilty and presented mitigation evidence at the sentencing hearing before the circuit judge. He neither informally requested the circuit judge to disqualify himself from the sentencing proceedings nor submitted an affidavit seeking a change of judge. When this Court specifically remanded Page's appeal to the circuit court for a proportionality review in light of co-defendant Hoadley's sentence, Page did not seek to challenge the circuit judge's impartiality. In fact, this appeal marks Page's first attempt to seek recusal of the circuit judge. Thus, the time for statutorily seeking sentencing before a different judge has long since passed and is deemed waived on appeal. State v. Burgers, 1999 SD 140, ¶¶11-13, 602 NW2d 277, 279-80 (holding submission of a guilty plea waived the statutory right to seek recusal); *see* State v. Chamley, 1997 SD 107, ¶42, 568 NW2d 607, 619 (holding a defendant's argument and submission of motions before a judge functioned as a waiver of his right to seek recusal); *see also* SDCL 15-

_____

(. . . continued)

> proceeding for contempt committed in the presence of the court, or habeas corpus.

*See* SDCL 15-12-21.1 (requiring a party to informally request a judge to disqualify himself before filing an affidavit for change of judge).

#21864

12-27 (setting out the time for seeking removal of a judge presiding in ordinary course).

[¶15.] Having determined that Page's statutory right to disqualify the circuit judge was waived, we must now address Page's contention that it was plain error for the circuit judge to sentence him after sentencing co-defendant Piper to death. Our plain error analysis under SDCL 23A-44-15 requires (1) error; (2) that is plain; (3) that affects substantial rights; and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." State v. Dillon, 2001 SD 97, ¶12, 632 NW2d 37, 43 (quoting State v. Robinson, 1999 SD 141, ¶17, 602 NW2d 730, 735). Generally, "[w]e invoke our discretion under the plain error rule cautiously and only in 'exceptional circumstances.'" Robinson, 1999 SD 141, ¶17, 602 NW2d at 735 (quoting State v. Nelson, 1998 SD 124, ¶8, 587 NW2d 439, 443). Such exceptional circumstances may exist where error would "seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. (quoting Nelson, 1998 SD 124, ¶8, 587 NW2d at 443). Given the level of deference ordinarily afforded a circuit judge's decision to sit on a case, it would be rare for this Court to review such a decision under the rubric of plain error.

[¶16.] Even utilizing the plain error doctrine in this case, Page's argument fails because we do not believe he has shown it was error for the circuit judge to sentence him. "The decision to preside over a case lies within the sound discretion of the trial judge." Hoadley, 2002 SD 109, ¶32, 651 NW2d at 257 (quoting Goodroad, 1997 SD 46, ¶25, 563 NW2d at 132). As we have consistently stated, this Court presumes a judge was impartial absent a specific and substantial

showing to the contrary. *Id.* ¶32 (citing United States v. Walker, 920 F2d 513, 517 (8thCir 1990) (citation omitted)). The Code of Judicial Conduct directs a judge to disqualify himself or herself where "the judge's impartiality might reasonably be questioned" due to his or her "personal bias or prejudice concerning a party... ." SDCL chapter 16-2 app., Code of Jud. Conduct, Canon 3E(1)(a). In regard to judicial bias, we have recognized that:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

*Hoadley*, 2002 SD 109, ¶32, 651 NW2d at 257 (quoting Von Kahl v. United States, 242 F3d 783, 793 (8thCir 2001) (quoting Liteky v. United States, 510 US 540, 114 SCt 1147, 127 LEd2d 474 (1994))). Similarly, this Court defined prejudice in *Hoadley* as:

> The attitude of personal enmity towards the party or in favor of the adverse party to the other party's detriment. It is not the mere possession of views regarding the law or the conduct of a party. Prejudice is in the personal sense rather than in the judicial sense and refers to a mental attitude or a disposition of the judge towards a party. In order for the alleged bias and prejudice to be disqualifying, it must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from participation in the case.

*Id.* ¶33, 651 NW2d at 258 (citing *In re* C.N.H., 998 SW2d 553, 560 (MoCtApp 1999)). Based upon these definitions, we rejected co-defendant Hoadley's argument that the circuit judge was unable to be fair and impartial during his trial because the judge had previously sentenced Piper and Page. *Id.* ¶¶31-34.

[¶17.]     Similarly, we do not believe Page has presented any evidence to constitute a legitimate basis on which to call into question the circuit judge's impartiality.  As grounds for disqualification, Page contends the circuit judge exhibited empathy and/or sympathy for the victim and did not sufficiently consider mitigation evidence.[6]  These arguments, however, do not establish a deep-seated antagonism against Page by the circuit judge or suggest Page was prejudiced from an extrajudicial source.  Absent such a showing that a fair judgment was impossible, it was not error for the circuit judge to sentence Page after sentencing his co-defendant Piper, and, therefore, Page has failed to show plain error.

[¶18.]     Finally, Page argues that the circuit judge's sentencing decision should be overturned under the statutorily mandated review of SDCL 23A-27A-12, which requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor[.]"  Page reasserts his arguments that the circuit judge should have recused himself from sentencing and further points out that a juror could not have served on all three co-defendants' cases.  We have already established the circuit judge's decision to sentence Page did not constitute error resulting from undue prejudice or personal bias.  While it is true that a juror would have been precluded from serving in all three co-defendants' cases under SDCL 23A-20-13.1(17), no such rule for disqualifying judges exists under South Dakota law or opinions of the United States

---

6.     We directly address Page's argument concerning mitigation evidence in our discussion of Issue 5.

Supreme Court. Page has failed to show the circuit judge's decision to sentence him was the result of passion, prejudice, or any other arbitrary factor.

[¶19.] **2. Whether SDCL 23A-27A-1 fails to sufficiently limit the class of persons who may be deemed eligible for the death penalty.**

[¶20.] Page next asserts SDCL 23A-27A-1 fails to sufficiently limit the class of defendants eligible for the death penalty under South Dakota's statutory scheme in violation of the Eighth and Fourteenth Amendments. Page believes that rather than limiting the class, SDCL 23A-27A-1 functions to "place all first-degree murder defendants in peril of the death sentence." As this claim is based upon a challenge to the constitutionality of a statute, our review is de novo. State v. Asmussen, 2003 SD 102, ¶2, 668 NW2d 725, 728.

[¶21.] To pass constitutional muster, a state's death penalty statutory scheme "must channel the sentencer's discretion by clear and objective standards[.]" *Rhines*, 1996 SD 55, ¶138, 548 NW2d at 447 (quoting Godfrey v. Georgia, 446 US 420, 428, 100 SCt 1759, 1764-65, 64 LEd2d 398 (1980) (Stewart, J., plurality). This is accomplished when the statutory scheme "genuinely narrow[s] the class of persons eligible for the death penalty" and is not based upon unconstitutionally vague factors. *Id.* ¶139 (citing Zant v. Stephens, 462 US 862, 877, 103 SCt 2733, 2742, 77 LEd2d 235 (1983); and Tuilaepa v. California, 512 US 967, 972, 114 SCt 2630, 2635, 129 LEd2d 750 (1994)).

[¶22.] In order for a sentencer to consider imposing the death penalty in South Dakota, one of the following aggravating circumstances listed in SDCL 23A-27A-1 must be found beyond a reasonable doubt:

(1) The offense was committed by a person with a prior record of conviction for a Class A or Class B felony, or the offense of murder was committed by a person who has a felony conviction for a crime of violence as defined in subdivision 22-1-2(9);

(2) The defendant by the defendant's act knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person;

(3) *The defendant committed the offense for the benefit of the defendant or another, for the purpose of receiving money or any other thing of monetary value*;

(4) The defendant committed the offense on a judicial officer, former judicial officer, prosecutor, or former prosecutor while such prosecutor, former prosecutor, judicial officer, or former judicial officer was engaged in the performance of such person's official duties or where a major part of the motivation for the offense came from the official actions of such judicial officer, former judicial officer, prosecutor, or former prosecutor;

(5) The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person;

(6) *The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.* Any murder is wantonly vile, horrible, and inhuman if the victim is less than thirteen years of age;

(7) The offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties;

(8) The offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement;

(9) *The offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of the defendant or another*; or

(10) The offense was committed in the course of manufacturing, distributing, or dispensing substances listed in Schedules I and II in violation of § 22-42-2.

(emphasis added). We have previously held that the aggravating factors under SDCL 23A-27A-1 are constitutional. *Rhines I*, 1996 SD 55, ¶¶74-76, 548 NW2d at 437 (noting that the Supreme Court upheld a virtually identical statutory scheme in *Gregg v. Georgia*, 428 US 153, 96 SCt 2909, 49 LEd2d 859 (1976)). In *Moeller II*, 2000 SD 122, ¶176 n18, 616 NW2d at 465 n18, we held this issue to be sufficiently resolved by our previous opinions and declined to address the issue. In this case, the circuit court found that the aggravating factors listed in SDCL 23A-27A-1(3), (6), and (9) applied to Page's convictions. We have previously upheld impositions of the death penalty based upon these specific aggravating factors in *Rhines I*, 1996 SD 55, ¶181, 548 NW2d at 455 (affirming sentence of death where SDCL 23A-27A-1(3) and (9) were found beyond a reasonable doubt), and *Moeller II*, 2000 SD 122, ¶¶98-120, 616 NW2d at 450-55 (upholding imposition of the death penalty where SDCL 23A-27A-1(6) was proved beyond a reasonable doubt). Today, we once again uphold the constitutionality of SDCL 23A-27A-1.

[¶23.] **3.** **Whether the circuit court utilized a vague and overbroad aggravating factor when it determined that Page was eligible for the death penalty.**

[¶24.] The circuit court determined that the aggravating circumstances listed in SDCL 23A-27A-1(3), (6), and (9) were present beyond a reasonable doubt in Page's case. Page contends SDCL 23A-27A-1(6) is unconstitutionally vague, and therefore the circuit court committed reversible error in finding the three aggravating factors set out in the statute. SDCL 23A-27A-1(6) provides:

> The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved *torture, depravity of mind, or an aggravated battery to the victim.*

(emphasis added).  Page points to our decision in *Rhines I*, 1996 SD 55, 548 NW2d 415, and *Moeller I*, 1996 SD 60, 548 NW2d 465, as evidence that this statute is unconstitutionally vague.  We employ the de novo standard of review to this claim. *Asmussen*, 2003 SD 102, ¶2, 668 NW2d at 728.

[¶25.]     Under the Eighth and Fourteenth Amendments, state statutory schemes must not "cause the death penalty to be wantonly and freakishly imposed," and must be applied "in a manner that avoids the arbitrary and capricious infliction of the death penalty."  *Rhines I*, 1996 SD 55, ¶138, 548 NW2d at 447 (citing Lewis v. Jeffers, 497 US 764, 774, 110 SCt 3092, 3099, 111 LEd2d 606 (1990) and quoting *Godfrey*, 446 US at 428, 100 SCt at 1764-65, 64 LEd2d 398)).  In order to accomplish these constitutional mandates, state death penalty statutes must "genuinely narrow the class" of defendants and the "aggravating circumstance[s] may not be unconstitutionally vague."  *Id.* ¶139 (citing *Zant*, 462 US at 877, 103 SCt at 2742, 77 LEd2d 235 and *Tuilaepa*, 512 US at 972, 114 SCt at 2635, 129 LEd2d 750).  A statute is unconstitutionally vague if it leaves juries and reviewing courts with "open-ended discretion" in "what they must find to impose the death penalty."  *Id.*  (citing Maynard v. Cartwright, 486 US 356, 361-62, 108 SCt 1853, 1858, 100 LEd2d 372 (1988)).

[¶26.]     In *Rhines I* and *Moeller I*, we held "[t]here is little doubt that the language of SDCL 23A-27A-1(6), by itself, is vague and overbroad."  1996 SD 55, ¶144, 548 NW2d at 448; 1996 SD 60, ¶114, 548 NW2d at 491.  We recognized, however, that if a trial court "further defines and limits those otherwise vague and overbroad terms so as to provide adequate guidance to the sentencer, then

constitutional requirements are satisfied." *Id.* (quoting *Rhines I*, 1996 SD 55, ¶145, 548 NW2d at 449). Accordingly, our opinion in *Moeller I* upheld imposition of the death penalty based in part on SDCL 23A-27A-1(6) because the trial court provided adequate guidance to the jury in the form of limiting instructions. *Id.* ¶117, 548 NW2d at 492.

[¶27.] In this case, Page accurately points out that the circuit court did not specifically articulate any jury instructions or limiting definitions in its application of SDCL 23A-27A-1(6), but this fact alone does not entitle Page to relief based on a claim of vagueness. As the Supreme Court pronounced in *Walton v. Arizona*:

> When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in *Maynard* and *Godfrey*. *But the logic of those cases has no place in the context of sentencing by a trial judge.* Trial judges are presumed to know the law and to apply it in making their decisions. If the Arizona Supreme Court has narrowed the definition of the "especially heinous, cruel or depraved" aggravating circumstance, we presume that Arizona trial judges are applying the narrower definition. It is irrelevant that the statute itself may not narrow the construction of the factor.

497 US 639, 653, 110 SCt 3047, 3057, 111 LEd2d 511 (1990) (emphasis added), *overruled on other grounds by* Ring v. Arizona, 536 US 584, 122 SCt 2428, 153 LEd2d 556 (2002). Here, as in *Walton*, a circuit court, not a jury, imposed the death penalty upon Page. Thus, our operative inquiry is whether this Court has sufficiently provided narrowing interpretations of the aggravating factors found in SDCL 23A-27A-19(6).

[¶28.] We conclude that this Court has provided adequate guidance to South Dakota circuit courts through our narrowing interpretations of SDCL 23A-27A-1(6). In *Rhines I*, 1996 SD 55, ¶¶161-64, 548 NW2d at 452, and again in *Moeller II*, 2000 SD 122, ¶¶112-16, 616 NW2d at 453-54, we discussed and approved narrowing instructions in regard to the aggravating factor of "torture." We further approved the trial court's limiting instructions concerning "depravity of mind" in *Moeller I*, 1996 SD 60, ¶118, 548 NW2d at 492-93, after noting the Supreme Court had previously validated a similar instruction in *Walton*, 497 US at 655, 110 SCt at 3058, 111 LEd2d 511 (citation omitted). Limiting instructions for "aggravated battery" were similarly upheld in *Moeller I*, 1996 SD 60, ¶¶115, 118-20, 548 NW2d at 492-93, and affirmed by our opinion in *Moeller II*, 2000 SD 122, ¶¶117-20, 616 NW2d at 454-55. As we presume the circuit court was familiar with these decisions, (*supra* note 4), it was not error for it to apply the aggravating factors found in SDCL 23A-27A-1(6) without specifically announcing which narrowing instructions it applied.[7] *See* Sochor v. Florida, 504 US 527, 536-37, 112 SCt 2114, 2121-22, 119 LEd2d 326 (1992) (presuming a trial judge was familiar with the state supreme court's authoritative construction of a vague aggravating factor); *Walton*, 497 US at 653, 110 SCt at 3057, 111 LEd2d 511 (presuming trial judges are

---

7. This presumption is particularly strong here, given the fact that the circuit judge participated as a member of this Court during its formulation and issuance of the *Rhines I*, 1996 SD 55, 548 NW2d 415; *Moeller I*, 1996 SD 60, 548 NW2d 465; and *Moeller II,* 2000 SD 122, 616 NW2d 424, decisions.

applying a narrower definition as articulated by the state supreme court). Page's

claim for relief based upon a vagueness challenge to SDCL 23A-27A-1(6) fails.

[¶29.] **4.    Whether there was insufficient evidence in the record from which the circuit court could have reasonably determined that the State met its burden of proving the aggravating factors defined in SDCL 23A-27A-1(3), (6), and (9).**

[¶30.]        We now turn to Page's contention that there was insufficient evidence

in the record for the circuit court to find beyond a reasonable doubt that five

aggravating factors listed in subsections (3), (6) and (9) of the statute existed.

Under the South Dakota capital punishment scheme, in cases where a defendant

requests sentencing by the court, the circuit judge must determine that at least one

aggravating factor exists beyond a reasonable doubt in order to impose the death

penalty. SDCL 23A-27A-6. Pursuant to SDCL 23A-27A-12(2), this Court is

required to determine whether the circuit court's finding of aggravating

circumstances was supported by the evidence.

[¶31.]        *a.    SDCL 23A-27A-1(3)*

[¶32.]        SDCL 23A-27A-1(3) defines one aggravating circumstance as follows:

"The defendant committed the offense for the benefit of the defendant or another,

for the purpose of receiving money or any other thing of monetary value." Page

argues the circuit court's finding of this aggravating factor was not supported by the

evidence because he did not have the specific intent to kill Poage for his property,

and because he thought the group would leave the victim alive at Higgins Gulch.

[¶33.]    Page's argument is without merit.  The record clearly supports the circuit court's determination that Page knew Poage was to be killed after the group went to Higgins Gulch.  Page engaged in a conversation with Piper concerning the "best" way to kill Poage while the group was still at the house in town.  When a suggestion was raised to slit Poage's throat, Page objected solely because he did not want to get blood in the house.  In fact, Page, Piper, and Hoadley specifically took the victim to Higgins Gulch because they knew it was a remote area where few people went.

[¶34.]    Additionally, Page participated in taking Poage's property both during the ordeal and after killing the victim.  Page began the attack on Poage by pointing a pistol at him and announcing that the group was "jacking" him of his possessions.  For his participation in the murder, Page received Poage's stereo, clothes, and vehicle, the most valuable piece of property taken by the group.  As the Arizona Supreme Court recently observed:

> Where as here, the killing and robbery take place almost simultaneously, we will not attempt to divine the evolution of the defendant's motive in order to discern when, or if, his reason for harming the victim shifted from pecuniary gain to personal "amusement" or some other speculative non-pecuniary drive.

State v. Canez, 42 P3d 564, 594 (Ariz 2002) (upholding a trial court's finding of a statutory aggravating circumstance that "the defendant committed the offense …  in expectation of the receipt of anything of pecuniary value") (citing State v. Medina, 975 P2d 94, 103 (Ariz 1999) (quoting State v. Rienhardt, 951 P2d 454, 466 (Ariz 1997))).  The record contains ample evidence to support the circuit court's finding of the aggravating circumstance in SDCL 23A-27A-1(3).

[¶35.]        *b.        SDCL 23A-27A-1(6)*

[¶36.]        The circuit court further found that the aggravating circumstances set out in SDCL 23A-27A-1(6) were present beyond a reasonable doubt.  The relevant portion of SDCL 23A-27A-1(6) provides:  "The offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."  Page argues that insufficient evidence existed for a finding of the aggravating circumstances under this statute because he "did not plan for Poage to die" and because he "displayed concern for the victim" at various times.  As explained in our analysis of Issue 3, SDCL 23A-27A-1 is, by itself, vague.  Our previous decisions, however, have provided guidance concerning acceptable interpretations of the aggravating factors contained in the statute.

[¶37.]        *i.        "Torture" definition*

[¶38.]        Our opinion in *Rhines I* observed that an acceptable interpretation of "torture" as used in SDCL 23A-27A-1(6) included two elements:  "(1) the unnecessary and wanton infliction of severe pain, agony, or anguish; and (2) the intent to inflict such pain, agony, or anguish."  1996 SD 55, ¶161, 548 NW2d at 452.  *See also Moeller II*, 2000 SD 122, ¶115, 616 NW2d at 454 (reaffirming this definition of "torture").  The purpose of this interpretation is to "eliminat[e] from the pool of death-eligible murderers those who intended to kill their victims painlessly or instantly or who only intended to cause pain that was incidental to death."  *Moeller II*, 2000 SD 122, ¶115, 616 NW2d at 454 (citing *Rhines I*, 1996 SD 55, ¶161, 548 NW2d at 452).  As noted above, we presume the circuit court was familiar with

this interpretation.  *See Sochor*, 504 US at 536-37, 112 SCt at 2121-22, 119 LEd2d 326.

[¶39.]    Under this interpretation of "torture," Page's challenge to the sufficiency of the evidence must fail.  Page debated the relative methods of killing Poage in front of the conscious victim, including slitting his throat.  Page forced Poage to lie in the snow and then kicked more snow on top of his naked body.  When Poage attempted to escape to save his life, Page ran him down and forced him into the icy creek.  By his own admission, Page kicked the victim in the head so many times and with such force that it made his own foot sore.  Taking Poage's head in his arms, Page was the first to stab the victim.  When Poage asked him "What are you doing?"  Page told him to "just sit there" and then plunged his knife all the way into Poage's neck.  Page chuckled when Piper made jokes about the amount of pain the victim was enduring.  Finally, Page dropped several heavy rocks on Poage's skull before the victim finally expired in the icy creek.  These events clearly support the circuit court's determination that Page inflicted severe pain, agony, and anguish upon Poage before murdering him.

[¶40.]    *ii.    "Depravity of mind" and "aggravated battery" definitions*

[¶41.]    In *Moeller II*, we upheld a trial court's narrowing instruction of "depravity of mind" requiring a finding that the defendant acted with "indifference to the life or suffering of the victim … [with] a corrupt, perverted or immoral state of mind on the part of the [d]efendant in excess of what was required to accomplish the murder."  2000 SD 122, ¶¶103-11, 616 NW2d at 452-53.  *See Moeller I*, 1996 SD

60, ¶118, 548 NW2d at 492-93.  Similarly, we approved an instruction of "aggravated battery" that required findings of:

> (1)   the infliction of serious physical abuse upon the victim, by depriving her of a member of her body, by rendering a member of her body useless, or by seriously disfiguring her body or a part of her body; and
>
> (2)   the defendant ... had the specific intention, design, or purpose of maliciously inflicting unnecessary pain to the victim ... [which] implies suffering in excess of what was required to accomplish the murder.

*Moeller II*, 2000 SD 122, ¶¶117-20, 616 NW2d at 454-55.  *See Moeller I*, 1996 SD 60, ¶115, 548 NW2d at 492.  We assume the circuit court was aware of and followed these narrowing interpretations.  *See Sochor*, 504 US at 536-37, 112 SCt at 2121-22, 119 LEd2d 326.

[¶42.]        In light of these limiting interpretations, we reject Page's sufficiency of the evidence arguments.  Page made Poage drink a mixture of pills, beer, and hydrochloric acid.  Page kicked Poage in the head numerous times with great force at the gulch.  On a late winter's night, Page forced the victim to lie naked in the snow and in an ice-cold creek for an extended period of time.  Page talked to the victim as he stabbed him in the throat.  Finally, Page dropped numerous heavy stones on Poage's head before the victim died.  Page did all of these things over the span of a few hours, despite Poage's cries of pain and pleas for mercy.  Viewing this evidence in the light most favorable to Page's sentence, we believe there was ample support for the circuit court's determination that Page acted with a depraved mind while committing an aggravated battery upon Poage.

[¶43.]     *c.     SDCL 23A-27A-1(9)*

[¶44.]     The circuit court also determined that an aggravating circumstance existed as defined in SDCL 23A-27A-1(9): "The offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of the defendant or another[.]" Page argues that the evidence is insufficient to establish that he participating in murdering Poage in order to eliminate him as a witness. Rather, he contends he only participated in killing Poage at the direction of co-defendant Piper.

[¶45.]     Page's assertion is without merit. By Page's own admission, the group took Poage to Higgins Gulch specifically because it was a secluded area where few people ever went. The group killed Poage in the gulch and then left his body in the remote area. Poage knew Page and would have been able to easily identify Page as one of his attackers, but his murder left no witness to the crime. The transporting of a robbery victim to a remote area in order to accomplish his murder can hardly be understood as anything other than a means of destroying or hiding evidence of a crime. The record contains more than sufficient evidence to support the circuit court's finding beyond a reasonable doubt that Page's conduct was an aggravating circumstance as defined by SDCL 23A-27A-1(9).

[¶46.]     **5.     Whether the circuit court deprived Page of an individualized sentencing hearing in violation of the Eighth and Fourteenth Amendments.**

[¶47.]     Page next asserts that the circuit court unconstitutionally deprived him of an individualized sentencing hearing because it failed to adequately take into account the mitigation evidence he presented. Page also alleges the circuit

court failed to correctly evaluate the mitigation evidence. Essentially, Page believes that the evidence in mitigation he presented was so compelling that no judge could have rationally imposed the death penalty in his case.

[¶48.]        In order for a defendant to become eligible for capital punishment in South Dakota, one of the ten aggravating circumstances provided in SDCL 23A-27A-1 must be proved beyond a reasonable doubt. Pursuant to SDCL 23A-27A-2, "[i]n all cases in which the death penalty may be imposed," a presentence hearing is required at which "*all* relevant evidence, including … any mitigating circumstances" must be heard. (emphasis added). "The law permits the jury to consider any mitigating circumstances, but does not impose any standard of proof regarding mitigation." *Rhines I*, 1996 SD 55, ¶78, 548 NW2d at 437 (citing SDCL 23A-27A-1 and 2).

[¶49.]        The Supreme Court has issued several opinions stressing the necessity of individualized sentencing in capital cases. In *Lockett v. Ohio*, the Supreme Court held that individualized sentencing in death penalty cases is constitutionally required under the Eighth and Fourteenth Amendments. 438 US 586, 606, 98 SCt 2954, 2966, 57 LEd2d 973 (1978). Based upon this constitutional mandate, the *Lockett* Court held that juries in capital cases must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 US at 604, 98 SCt 2964-65, 57 LEd2d 973. In *Eddings v. Oklahoma*, the Court went on to state that it would be an error of law for a sentencer to refuse to consider any relevant mitigating evidence proffered by a

capital defendant. 455 US 104, 113-14, 102 SCt 869, 876-77, 71 LEd2d 1 (1982) "(holding that a sentencer's refusal to take into account a sixteen year old capital defendant's difficult family history" and "severe emotional disturbance" violated its decision in *Lockett*). Additionally, in *Mills v. Maryland*, 486 US 367, 108 SCt 1860, 100 LEd2d 384 (1988), and *McKoy v. North Carolina*, 494 US 433, 110 SCt 1227, 108 LEd2d 369 (1990), the Supreme Court struck down those death penalty schemes that required juries to consider only those mitigating factors found unanimously. *See* Beard v. Banks, 542 US 406, 410, 124 SCt 2504, 2509-10, 159 LEd2d 494 (2004) (holding that *Mills* announced a new rule of constitutional law that nevertheless may not be applied retroactively).

[¶50.] We have recognized and applied the rationale of *Lockett* and its progeny saying "[i]t is imperative that the jury be permitted to weigh *all* relevant mitigating evidence, and any attempt to limit consideration of such evidence is rejected by this Court." *Moeller I*, 1996 SD 60, ¶130, 548 NW2d at 494 (emphasis added). *See Rhines I*, 1996 SD 55, ¶¶80-82, 548 NW2d at 437-38. We have recognized, however, that South Dakota law imposes no specific standard of proof in regard to mitigation. Rhines v. Weber, 2000 SD 19, ¶39 n9, 608 NW2d 303, 312 n9 (*Rhines II*) (citing SDCL 23A-27A-1 and 2). In *Rhines I*, we acknowledged:

> We have rejected the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." Franklin v. Lynaugh, 487 US 164, 179, 108 SCt 2320, 2330, 101 LEd2d 155, 169 (1988). Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer.

1996 SD 55, ¶82, 548 NW2d at 438 (quoting Harris v. Alabama, 513 US 504, 512, 115 SCt 1031, 1035, 130 LEd2d 1004 (1995)). In addition, we have also held that "South Dakota law does not require the weighing of aggravating circumstances against mitigating factors. Although the jury is free to consider all mitigating circumstances, they need only find one statutory aggravating factor beyond a reasonable doubt to impose the death penalty." *Rhines II*, 2000 SD 19, ¶53, 608 NW2d at 314 (citing *Rhines I*, 1996 SD 55, ¶¶78-82, 169, 548 NW2d at 437-38, 453).

[¶51.]    As required by the Federal Constitution and South Dakota law, the circuit court allowed Page to offer an extensive amount of evidence in mitigation. In its findings of fact and conclusions of law, the circuit court wrote that it "[gave] due consideration to the mitigating circumstances" presented by Page. The court noted that Page had called nineteen witnesses on his behalf at the sentencing hearing, each of which the circuit judge named from the bench. At the sentencing hearing, the circuit court acknowledged the mitigating circumstances in Page's case, saying:

> I've considered the evidence in mitigation. I've considered your young age and your background. Your early years must have been a living hell. Most people treat their pets better than your parents treated their kids.
>
> It's also apparent from your background that there was a point in time when people and professional people offered help in the form of foster care, group care, psychological treatment, psychiatric counseling. Some of these people have testified on your behalf.

[¶52.]    Despite this mitigating evidence, however, the circuit court believed the specific circumstances of Page's case justified the imposition of the death penalty. As detailed under our analysis in Issue 4, the circuit court determined that

several aggravating factors were present in Page's case. The circuit court was not required to utilize any specific formula to weigh Page's mitigating evidence against the particularly heinous aggravating circumstances it found in this case. *See Rhines II*, 2000 SD 19, ¶53, 608 NW2d at 314. The fact that the court imposed the death penalty does not mean that it ignored Page's evidence in mitigation – "[t]he law permits mercy but does not require it." *Rhines I*, 1996 SD 55, ¶182, 608 NW2d at 455. The record does not support Page's argument that he was deprived of individualized sentencing.

[¶53.] **6.** **Whether the selective application of South Dakota's mandatory capital sentencing procedures is unconstitutional.**

[¶54.] Although Page argued this issue before our ruling in *Moeller v. Weber*, 2004 SD 110, 689 NW2d 1 (*Moeller III*), our decision in that case fully resolved the identical question. *Moeller III*, 2004 SD 110, ¶¶42-51, 689 NW2d at 14-18. Thus, we need not reexamine it here. In accord with our holding in *Moeller III*, Page did not suffer an unconstitutional application of South Dakota's capital sentencing procedures.

[¶55.] **7.** **Whether Page's death sentence was grossly disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.**

[¶56.] In every case where the death penalty is imposed, this Court is required to conduct an independent review of the sentence. SDCL 23A-27A-9. We must determine:

> (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

> (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A-27A-1; and
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

SDCL 23A-27A-12; *Moeller II*, 2000 SD 122, ¶163, 616 NW2d at 462-63; *Rhines I*, 1996 SD 55, ¶180, 548 NW2d at 454-55.

[¶57.]		First, we must determine whether Page's sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We have already rejected Page's claim that it was error for the circuit court to sentence him after it sentenced co-defendant Piper to death. We have also determined that the circuit court adequately considered the evidence in mitigation presented by Page at the sentencing hearing. We conclude no extenuating circumstance influenced Page's sentence and decline to reverse his sentence on any of these grounds.

[¶58.]		Next, we must determine whether the evidence supported the circuit court's finding of the alleged aggravating circumstances in Page's case beyond a reasonable doubt. After rejecting Page's constitutional challenges to the aggravating factors set out in SDCL 23A-27A-1, we concluded under our analysis of Issue 4 that ample evidence existed to support the circuit court's findings of the aggravating factors listed in SDCL 23A-27A-1(3), (6), and (9). Thus, Page is entitled to no relief based upon any of his theories challenging the evidence of aggravating factors in his case.

[¶59.]    Third, we must address whether Page's sentence is disproportionate when compared to sentences in similar South Dakota cases, considering both the crime and the defendant.  SDCL 23A-27A-13 provides that "[t]he court shall include in its decision a reference to those similar cases which it took into consideration."  In *Rhines I*, we stated:

> We conclude that similar cases for purposes of SDCL 23A-27A-12(3) are those cases in which a capital sentencing proceeding was actually conducted, whether the sentence imposed was life or death.  "Because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar ... are those in which imposition of the death penalty was properly before the sentencing authority for determination."

1996 SD 55, ¶185, 548 NW2d at 455-56 (quoting Tichnell v. State, 468 A2d 1, 15-16 (Md 1983) (citation omitted)).  With this holding, we rejected the defendant's argument that "the pool of similar cases for proportionality review should encompass all homicide cases that were prosecuted or could have been prosecuted under the State's current capital punishment scheme."  *Id.* ¶184, 548 NW2d at 455.  Our opinion in *Moeller II* rejected a similar argument.  2000 SD 122, ¶167, 616 NW2d at 463.  Accordingly, we decline to address Page's contention that the proper universe of similar cases is all convictions for Class A felonies in South Dakota.

[¶60.]    Instead, we consider only those cases that resulted in a capital sentencing proceeding.  Since the 1979 enactment of South Dakota's current capital punishment scheme, thirteen capital sentencing proceedings, including those of Page and his co-defendants Piper and Hoadley, have been conducted.  In seven of those proceedings, the jury declined to impose the death penalty and sentenced the

defendant to life imprisonment. Our opinion in *Rhines I* summarized six of these cases. *See* 1996 SD 55, ¶¶187-204, 548 NW2d at 456-57; s*ee also Moeller II*, 2000 SD 122, ¶168, 616 NW2d 424, 463-64 (taking judicial notice of the case summaries set out in *Rhines I*). Co-defendant Hoadley's conviction represents the seventh case. *Hoadley*, 2002 SD 109, 651 NW2d 249. In *Rhines I*, 1996 SD 55, 548 NW2d 415, *Moeller I*, 1996 SD 60, 548 NW2d 465 and *State v. Anderson*, 2003 SD 65, 664 NW2d 48 *(Anderson II)*, the jury imposed the death sentence. We take judicial notice of the summaries of each of these cases as forth in *Rhines I*, 1996 SD 55, ¶196, 548 NW2d at 456 (summarizing *Moeller I*) and *Moeller II*, 2000 SD 122, ¶¶169-171, 616 NW2d at 464 (summarizing *Rhines I, Anderson I and Anderson II*).[8] We take further judicial notice of co-defendant Piper's case. State v. Piper, 2006 SD 1, __ NW2d __.

[¶61.]     After comparing Page's sentence of death with the other cases in the proportionality pool, we conclude his sentence was not disproportionate considering Page's criminal actions. First, we note the only other case that involved the presence of as many aggravating factors as were found in Page's case was in defendant Rhine's case. Since 1979, only defendants Moeller, Rhines, and Anderson

---

8.     The facts supporting Anderson's death penalty sentence are reviewed in *Moeller II*, 2000 SD 122, ¶¶169-171, 616 NW2d at 464. However, due to Anderson's suicide in 2003, the full facts that resulted in his conviction for the kidnapping and murder of Larisa Dumansky, and the rape and murder of Piper Streyle are not contained in *Anderson II*, 2003 SD 65, 664 NW2d 48. Additional facts pertaining to his conviction for the kidnapping of Streyle are contained in *State v. Anderson*, 2000 SD 45, 608 NW2d 644 (*Anderson I*).

have approached the sheer brutality exhibited by Page,[9] and all three defendants received the death penalty.

[¶62.] There is ample evidence in this case that Page subjected Poage to injury and pain far in excess of what was required to accomplish his murder. The amount of torture present in this case was unprecedented in South Dakota. Although the aggravating factor of torture was found in the cases of *Rhines*, *Moeller*, and *Anderson*, the evidence in this case shows that Page tortured Poage for at least three and one-half hours before Page was satisfied Poage was dead.

[¶63.] During that time Page, along with one of his co-defendants, rendered Poage helpless by tying him up with an extension cord. Page admitted to delivering multiple "full football kicks" to Poage's skull with his boots, so many times that his own foot was sore. Page forced the victim to drink a hydrochloric acid concoction while tied up and unable to move. Page stabbed the victim at least once, forcing his knife as far as he could into Poage's neck.

[¶64.] Directly in front of the conscious victim, Page discussed the "best" way to murder Poage, including slitting his throat. Page forced the almost completely nude Poage to endure freezing temperatures for an extended period of time. Like Rhines, Page taunted the victim throughout the ordeal. Page "chuckled" at the amount of pain the victim was experiencing. After stabbing Poage, Page allowed the victim to wash himself off in the icy stream in the false hope he would be allowed to bleed to death in the warmth, rather than in the cold. Finally, Page

---

9. *See* the analysis in *Piper*, 2006 SD 1, ¶¶40-43, __ NW2d at __, for a separate analysis of co-defendant Piper's acts.

dropped several heavy stones on the victim's head until Page concluded he was dead. Poage suffered terribly at the hands of Page.

[¶65.] "The disparity in suffering endured by victims is an important and legitimate consideration when evaluating the proportionality of a death sentence." *Rhines I*, 1996 SD 55, ¶207, 548 NW2d at 458. Based on the sheer brutality and torture inflicted upon the victim in this case, we conclude the imposition of the death penalty upon Page was neither excessive nor disproportionate.[10]

[¶66.]    **8.    Whether Page's death sentence was unconstitutionally imposed when the indictment failed to allege any aggravating circumstances.**

[¶67.]    In *Moeller III*, we dealt with this identical issue and held that failure to allege aggravating circumstances in an indictment is not unconstitutional under *Ring*, 536 US 584, 122 SCt 2428, 153 LEd2d 556. Since our holding in *Moeller III*, other state courts have likewise concluded that aggravating factors need not be pleaded in a state indictment. *See* Bustamonte v. Wall, 866 A2d 516, 522-23 (RI 2005) (holding no constitutional requirement that aggravating factors be set forth in grand jury indictment); McKaney v. Foreman ex rel County of Maricopa, 100 P3d 18, 22 (Ariz 2004) (no requirement that aggravating factors be pleaded in

---

10.    The only two sentencing options before the circuit court were life in prison without possibility of parole or death. In either case, baring executive clemency, the defendant would not ever be released back into society. Thus, the issue of rehabilitation is not of major concern. "Clearly there are some acts of such a criminal magnitude that they justify a life sentence [or death] whether the perpetrator is capable of rehabilitation or not. In such instances the sentence is not disproportionate to the crime." State v. Milk, 2000 SD 28, ¶18, 607 NW2d 14, 20.

indictment).  As in *Moeller III*, the State's formal notice of aggravating factors here

provided sufficient notice to Page under both our federal and state constitutions.

[¶68.]     **9.     Whether Page's death sentence was unconstitutionally imposed when SDCL 23A-27A-6 failed to allow a jury determination of the appropriate penalty upon a plea of guilty to the circuit court**

[¶69.]     Having rejected Page's first claim based upon *Ring*, we now turn to his

contention that the death penalty was unconstitutionally imposed.  Page also relies

on *Ring* to argue his case was unconstitutionally conducted because the circuit

court, rather than a jury, made the factual findings that the State had proved the

existence of aggravating circumstances beyond a reasonable doubt.[11]

[¶70.]     Specifically, Page asserts that SDCL chapter 23A-27A is

unconstitutional because it does not provide defendants who plead guilty to a

capital offense with an opportunity to have the aggravating circumstances found by

a jury as opposed to a judge.  Although in this case the circuit court offered Page the

opportunity to have a sentencing hearing in front of a jury, an option which Page

declined to exercise and instead specifically asked for the court to sentence him,

Page argues the circuit court did not have the authority under South Dakota law to

present him this option.

[¶71.]     We agree with Page's argument that under *Ring*, a capital sentencing

scheme would be unconstitutional if it prevented a defendant who pleaded guilty

---

11.    The analysis of this issue is based upon this Court's analysis of the same issue raised in *Moeller III*, 2004 SD 110, 689 NW2d 1.  Given the seriousness of the penalty herein, we re-state the *Moeller III* analysis as applicable to this opinion.  *See also Piper*, 2006 SD 1,¶¶47-68, __ NW2d at __ - __.

from having alleged aggravating circumstances found by a jury. *See Ring,* 536 US at 609, 122 SCt at 2443, 153 LEd2d 556. We do not believe, however, that there is any statutory impediment preventing a defendant who pleads guilty in a South Dakota state court from exercising his right to a jury at the penalty phase.

[¶72.] The South Dakota sentencing scheme involves two procedural statutes: SDCL 23A-27A-2 and SDCL 23A-27A-6. SDCL 23A-27A-2, which governs the procedure to be followed in capital cases where a jury makes the sentencing determination, requires the court to conduct a presentencing hearing before a jury. SDCL 23A-27A-2 provides:

> In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment. At such hearing the jury shall receive all relevant evidence, including:
>> (1) Evidence supporting any of the aggravating circumstances listed under § 23A-27A-1;
>> (2) Testimony regarding the impact of the crime on the victim's family;
>> (3) Any prior criminal or juvenile record of the defendant and such information about the defendant's characteristics, the defendant's financial condition, and the circumstances of the defendant's behavior as may be helpful in imposing sentence;
>> (4) All evidence concerning any mitigating circumstances.

SDCL 23A-27A-6, which governs the procedure to be followed in capital cases where a jury trial is waived and the court makes the sentencing determination, provides:

> In nonjury cases the judge shall, *after conducting the presentence hearing as provided in § 23A-27A-2*, designate, in writing, the aggravating circumstance or circumstances, if any, which he found beyond a reasonable doubt. Unless at least one of the

> statutory aggravating circumstances enumerated in § 23A-27A-1 is so found, the death penalty shall not be imposed.

(emphasis added).

[¶73.] We have long recognized the general rule that "[w]hen interpreting a statute we presume the legislature intended to enact a valid statute, and where 'a statute can be construed so as not to violate the constitution,' we will adopt such a construction." State v. Martin, 2003 SD 153, ¶26, 674 NW2d 291, 300 (quoting State v. Allison, 2000 SD 21, ¶25, 607 NW2d 1, 2). Therefore, we interpret SDCL 23A-27A-2 and SDCL chapter 23A-27 in general as providing for a sentencing hearing wherein a jury will determine the presence or absence of alleged aggravating factors when a defendant pleads guilty to a capital offense. We must reject as unconstitutional any reading of SDCL chapter 23A-27A that would *prevent* a capital defendant from having the opportunity to have a sentencing hearing before a jury.

[¶74.] The statutory scheme in SDCL chapter 23A-27A regulates the sentencing *procedure*. An examination of all relevant statutes reflects that SDCL 23A-27A-2 and 6 do not purport to regulate the *right* to jury sentencing in capital cases. There is certainly *no* language in either statute that clearly, or otherwise, states that the jury hearing on aggravating circumstances is inapplicable in nonjury cases when a defendant has pleaded guilty as Page claims. Instead, a correct reading reflects that the statutes simply do not speak to the subject of the *right* to jury sentencing. Indeed, the purpose of SDCL 23A-27A-2 is to describe the procedure to be followed in cases "which *are tried by a jury*," and SDCL 23A-27A-6 describes the procedure to be followed in "*nonjury* cases." (emphasis added.) This

emphasized language, cases "which *are tried* by a jury" and "*nonjury cases,*" demonstrates that these statutes do not purport to "prevent" the right of jury sentencing. Rather, this emphasized language demonstrates that the statutes presume that the *right* to jury trial has been determined elsewhere.

[¶75.] Therefore, the South Dakota statutes are unlike the Arizona statutes that were invalidated in *Ring*, 536 US 584, 122 SCt 2428, 153 LEd2d 556. The *Ring* statutes expressly governed the *right* to jury sentencing because they explicitly provided that *only a judge* could consider the aggravating circumstances and impose a death sentence.[12] *Id.* at 592, 122 SCt at 2434, 153 LEd2d 556. In contrast, the South Dakota statutes are simply silent on the subject of the right to jury sentencing. This silence is hardly surprising because most provisions in our criminal code fail to expressly grant or deny the right to a jury trial. Rather, the code provisions leave it to the state and federal constitutions and specific implementing statutes to regulate the right to a jury trial.

[¶76.] The state and federal constitutions provide the foundation for South Dakota's jury implementing statutes. The Sixth Amendment to the United States Constitution guarantees the right to a jury trial in capital cases without

---

12. The Arizona statutes stated: "[t]he hearing shall be conducted *before the court alone. The court alone* shall make all factual determinations required by this section or the constitution of the United States or this state." *Ring*, 536 US at 592, 122 SCt at 2434, 153 LEd2d 556 (emphasis added) (quoting Ariz Rev Stat Ann § 13-703(C)(2001), *amended by* 2002 Ariz Sess Laws, 5th Spec Sess, ch1, § 1).

qualification.[13]  Article VI, section 6 and section 7 of the South Dakota Constitution

also grant that right.  The South Dakota language provides:

> The right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy[.] [§ 6].
>
> In all criminal prosecutions the accused shall have the right ... to a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed. [§ 7].

"The obvious purpose of these [c]onstitutional provisions is to *guarantee* an accused

the right to trial by jury.  It is a right [that] cannot be denied or withheld by the

state."  State v. Thwing, 84 SD 391, 394, 172 NW2d 277, 278 (1969) (emphasis

added).  And, the scope of the right is broad.  It extends to all cases "where such

right existed at common law."  *See* State v. Mitchell, 3 SD 223, 226, 52 NW 1052,

1052 (1892).  Because the right to a jury trial in capital cases existed under the

common law at the time our Federal Constitution was adopted, there is no dispute

that the South Dakota Constitution guarantees that right in capital cases today.

*See* 1887 Dakota Terr Compiled Laws §§ 7322-7336, 7484, 7489; McCall v. United

States, 1 Dak 320, 46 NW 608 (Dakota Terr 1876).

[¶77.]        This constitutional guarantee has been implemented by two statutes

not considered by Page.  The first, SDCL 23A-18-1 (Rule 23(a)), affords the *right* to

jury trial in *all* cases contemplated by the constitutions.  The statute provides that:

---

13.    "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"  US Const amend. VI.

"[c]ases *required to be tried* by a jury *shall be so tried* unless the defendant waives a jury trial in writing or orally on the record with the approval of the court and the consent of the prosecuting attorney." *Id.* (emphasis added). Because it is well settled that both the guilt and sentencing phases of capital cases *are required to be tried by a jury*,[14] SDCL 23A-18-1 implements the constitutional guarantee and affirmatively directs that a jury *shall* be utilized. Thus, even if SDCL 23A-27A-2 and 23A-27A-6 fail to explicitly afford the right of jury sentencing, SDCL 23A-18-1 cures the alleged omission.

[¶78.] The second statute, SDCL 23A-45-13, further authorized the circuit court's offer of a jury sentencing in this case. In analyzing SDCL 23A-45-13, it must be reiterated that SDCL 23A-27A-2 and 23A-27A-6 are procedural statutes that do not expressly speak to the *right* of jury trial.[15] Therefore, in cases like this where

---

14. *See Ring*, 536 US at 609, 122 SCt at 2443, 153 LEd2d 556 (observing that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death").

15. There is no dispute that the *Ring* right of sentencing by jury is a matter of procedure. The United States Supreme Court so held, explaining:

> A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes. *See Bousley* [v. United States, 523 US 614] at 620-621, 118 SCt 1604[, 1620-1621, 140 LEd2d 828 (1998)] (rule "hold[s] that a … statute does not reach certain conduct" or "make[s] conduct criminal"); *Saffle* [v. Parks, 494 US 484,] 495, 110 SCt 1257[,108 LEd2d 415 (1990)] (rule "decriminalize[s] a class of conduct [or] prohibit[s] the imposition of … punishment on a particular class of persons"). In contrast, rules that regulate only the *manner of determining* the defendant's culpability are procedural. *See Bousley, supra,* at 620, 118 SCt 1604[, 140 LEd2d 828].

(continued . . .)

there is no statutory *prohibition* on the procedural right to a jury, SDCL 23A-45-13 authorizes the trial court to proceed "in any lawful manner." It provides "[i]f no procedure is specifically prescribed by statute or rule, a court may proceed in any lawful manner not inconsistent with this title or with any other applicable statute." SDCL 23A-45-13.

[¶79.] Thus, even if we were to accept Page's offered construction of SDCL chapter 23A-27A, that it does not authorize jury sentencing in capital cases following a guilty plea, other statutes provide that right. SDCL 23A-45-13 fills the void by authorizing a trial court to "proceed in any lawful manner." And, SDCL 23A-18-1 not only authorized, but *required* the circuit court to offer a jury hearing and sentencing. As this Court has previously noted, trial courts must use this latter statute to properly guarantee a defendant's constitutional rights and to "provide an effective manner to try the case." State v. Goodman, 384 NW2d 677, 680 (SD 1986).

[¶80.] In this case, however, Page specifically asked to be sentenced by the circuit court, thereby waiving his constitutional right to have a jury determine whether the alleged aggravating circumstances in his case existed beyond a reasonable doubt. "Even fundamental rights can be waived." State v. Garber, 2004 SD 2, ¶25, 674 NW2d 320, 327 (quoting State v. Henjum, 1996 SD 7, ¶13, 542 NW2d 760, 763). The circuit court properly presented Page with the option of

_____
(. . . continued)

> Schriro v. Summerlin, 542 US 348, 353, 124 SCt 2519, 2523, 159 LEd2d 442 (2004). *Schriro* went on to hold that "judged by this standard," the *Ring* right to have a jury determine aggravating circumstances in imposing the death penalty "is properly classified as procedural." *Id.*

exercising his right to sentencing by a jury as provided by South Dakota's capital punishment statutory scheme. It appears that Page may well have waived his right to a jury trial because he could not afford to have a jury hear the horrendous facts of his case, and he apparently believed that he might receive more favorable treatment before the circuit court.

[¶81.] Now on appeal, dissatisfied with his choice, he asks this Court to invalidate his voluntary waiver of a jury sentencing. Page argues that even though he did not want a jury sentencing, *if he would have wanted one,* that sentencing would have been unavailable. Page contends that the circuit court had no authority to offer jury sentencing, and therefore, the circuit judge's offer of jury sentencing was "illusory." In circular reasoning, Page concludes that such an illusory offer is insufficient to overcome an unconstitutionally imposed death sentence.

[¶82.] Page is mistaken in three respects. First, as was explained above, the circuit court was authorized to offer a jury hearing at the sentencing phase of this capital case. Even assuming that the circuit court had no specific authority to offer a jury sentencing under the capital sentencing statutes, SDCL 23A-18-1 and 23A-45-13 explicitly authorized, and in fact required, use of a jury unless waived. Thus, the circuit court's offer was not illusory.

[¶83.] Second, even if one were to assume that there was no statutory authority to offer jury sentencing, the waiver was still valid because the *Ring* analysis is inapplicable when a defendant waives the right to jury sentencing. While Page offers absolutely no authority for his contrary conclusion, all courts that have considered the issue uphold such waivers. The courts recognize that the *Ring*

analysis is inapplicable because the defendant in *Ring* pleaded not guilty and went to trial, but was deprived of jury sentencing. Because *Ring* is limited to cases where a defendant is deprived of a *requested* jury sentencing, the authorities hold that guilty pleas and waivers are valid even if the underlying sentencing scheme explicitly and unequivocally precludes the defendant from receiving a jury sentence. Colwell v. State, 59 P3d 463 (Nev 2002); Moore v. State, 771 NE2d 46 (Ind 2002).

[¶84.] For example, in *Colwell*, the Nevada Supreme Court considered this issue and concluded that "*Ring* is not applicable to [a defendant's] case [when], unlike *Ring*, [the defendant pleads] guilty and waive[s] his right to a jury trial." 59 P3d at 473. The Nevada Supreme Court reached that conclusion even though the Nevada statutory framework, like Arizona's,[16] unequivocally *eliminated* the right to a jury at sentencing. *Id.*[17] *Colwell* distinguished *Ring* because *Ring* pleaded not guilty and went to trial, unlike *Colwell* who pleaded guilty and waived his right to a jury trial. *Id.* *Colwell* ultimately observed that because the Supreme Court "has

---

16. *Colwell* described the Arizona sentencing scheme that was overturned in *Ring* as one in which, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." 59 P3d at 469.

17. The Nevada statute provided "that when a defendant pleads guilty to first-degree murder and the State seeks a death sentence, a panel of three district judges must 'conduct the required penalty hearing to determine the presence of aggravating and mitigating circumstances, and give sentence accordingly.'" *Id.* at 469 n60 (citing NevRevStat § 175.558, *repealed by* 2003 Nev Laws, c366, § 8).

held that the valid entry of a guilty plea in a state criminal court involves the waiver of several federal constitutional rights[, a]mong these … 'the right to trial by jury'[,] Colwell's guilty plea included an express waiver of his right to a jury trial and was valid." *Id.* at 474 (citing Boykin v. Alabama, 395 US 238, 243, 89 SCt 1709, 1712, 23 LEd2d 274 (1969)).

[¶85.]    The Indiana Supreme Court reached the same conclusion in *Moore,* 771 NE2d at 49.  In *Moore,* the Indiana statutes, like those in Nevada, unequivocally, and unconstitutionally, foreclosed any possibility of a right to jury sentencing following a plea of guilty.  *Id.*[18]  Nevertheless, the Indiana Supreme Court concluded that the defendant's voluntary plea of guilty to three counts of murder waived his entitlement to argue that the "Indiana capital sentencing statute violated the federal and state constitutions by depriving him of a jury determination of the aggravating circumstances that made him eligible for the death sentence."  *Id.*  *Moore* observed that because the defendant knew that his guilty plea would deprive him of access to a jury, he had forfeited his right to "have a jury recommend to the trial court whether or not a death penalty should be imposed against" the defendant.  *Id.*

[¶86.]    It must be further observed that Page's waiver is also valid under United States Supreme Court authority and a prior decision of this Court.  The

---

18.    "At the time of the offense, the statute, Indiana Code § 35-50-2-9 (Supp 1979), provided in relevant part, 'If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the court, or *the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing.'*  Ind Code § 35-50-2-9(d) (Supp 1979)."  *Id.* at 49 (emphasis in original).

United States Supreme Court has long held that a waiver of the right to a jury is valid even though the underlying right waived does not exist. *See* Patton v. United States, 281 US 276, 50 SCt 253, 74 LEd 854 (1930) (waiving the right to a jury composed of twelve persons) (*abrogated on other grounds by,* Williams v. Florida, 399 US 78, 90 SCt 1893, 26 LEd2d 446 (1970)). Similarly, in *Thwing,* 84 SD 391, 172 NW2d 277, this Court upheld waiver of a right to a jury trial even though the underlying right, an alleged right to a court trial, did not exist. This Court did so because "[t]he ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Id.* at 395-96, 172 NW2d at 279 (quoting Singer v. United States, 380 US 24, 85 SCt 783, 13 LEd2d 630 (1965)).

[¶87.]    As was previously pointed out, the law is quite settled that even assuming Page had no statutory right to a jury hearing at sentencing, his decision to waive that "nonexistent" statutory right and proceed with sentencing before the circuit court was a valid waiver of his constitutional right to jury sentencing. *See Colwell,* 59 P3d 463; *Moore,* 771 NE2d 46. *See also* Sanchez v. Superior Court, 126 CalRptr2d 200, 206 (CalCtApp 2002) (holding that after *Ring,* a defendant may validly waive his or her right to have the jury determine the degree of murder); People v. Jackson, 769 NE2d 21, 27 (Ill 2002) (stating that "[e]very fact necessary to establish the range within which a defendant may be sentenced is an element of the crime and thus falls within the constitutional rights of a jury trial and proof beyond a reasonable doubt, made applicable to the states by the due process clause of the fourteenth amendment. But by pleading guilty, a defendant *waives exactly those rights.*"); People v. Chandler, 748 NE2d 685, 690 (IllAppCt 2001) (stating that

"[h]aving waived a jury trial on all issues, defendant cannot now claim that he was deprived of the right to have a jury determine the issue of his future dangerousness"); State v. Edwards, 810 A2d 226, 234 (RI 2002) (holding that "[b]y waiving a jury, defendant accepted the procedure as followed in this case, that the trial justice, after finding him guilty of the offense of first-degree domestic murder, would proceed to find, as she did, that the aggravating circumstance of torture and aggravated battery had been proven beyond a reasonable doubt").

[¶88.]    It must also be observed that Page's argument against following settled waiver jurisprudence would shift to a capital defendant the exclusive right to control the sentence he or she receives.  In order to control the sentence, a defendant need merely waive the right to jury, or presumably some other constitutional right, at sentencing.  Should the defendant not receive the life sentence requested from the trial court, he or she then need only appeal arguing a denial of the constitutional right that he or she had expressly waived.  *See* People v. Rhoades, 753 NE2d 537, 544 (IllAppCt2001).  Because the reasoning advanced by Page requires the invalidation of sentences when this appellate argument is made, and because a life sentence must be imposed under SDCL 23A-27A-14 whenever a death sentence is invalidated by this Court, the procedural maneuvering sanctioned would guarantee a capital defendant the absolute right to obtain a life sentence. The Legislature could not have intended such an absurd result in enacting SDCL 23A-27A-2, 6, and 14.

[¶89.]    It must be finally noted that Page's third and final argument on this issue is based upon a hypothetical that he *might have* asked for jury sentencing.

#21864

However, Page lacks standing to assert the invalidity of his waiver based upon a hypothetical. Because Page waived the right to jury sentencing, he may not now argue that the statutes are unconstitutional as applied to him or someone else who *might have* requested a jury sentence. As the Supreme Court has explained:

> [a] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.[19]

County Court of Ulster County, N.Y. v. Allen, 442 US 140, 154-155, 99 SCt 2213, 2223, 60 LEd2d 777 (1979) (citing Broadrick v. Oklahoma, 413 US 601, 610, 93 SCt 2908, 2914, 37 LEd2d 830 (1973)).[20] This Court has also rejected such claims

---

19. "A limited exception has been recognized for statutes that broadly prohibit speech protected by the First Amendment. This exception has been justified by the overriding interest in removing illegal deterrents to the exercise of the right of free speech." *Allen*, 442 US at 155, 99 SCt at 2223, 60 LEd2d 777 (internal citation omitted).

20. In *Broadrick*, 413 US at 610-611, 93 SCt at 2915, 37 LEd2d 830, the United States Supreme Court explained why hypothetical challenges are not allowed:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously. These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.

(internal citations omitted.)

based on hypotheticals. "Judicial machinery should be conserved for problems which are real and present or imminent, not squandered on problems which are abstract or hypothetical or remote." Gottschalk v. Hegg, 89 SD 89, 95, 228 NW2d 640, 643-644 (1975) (citation omitted). Therefore, in determining the constitutionality of statutes, "'the mere fact that there might be a case[,] where to apply the provisions of [the statute] would result in [a constitutional violation,] does not render the [statute] unconstitutional, but merely prevents its application in such a case.'" City of Pierre v. Russell, 89 SD 70, 73, 228 NW2d 338, 341 (1975) (quoting Clark Implement Co. v. Wadden, 34 SD 550, 556-57, 149 NW 424, 426 (1914)). Page fails to acknowledge that although he has construed the capital sentencing scheme in such a way that it *could be applied* to violate the Sixth Amendment right to jury, *it was not so applied* in his case.

[¶90.]     In summary, Page argues that the South Dakota capital sentencing statutes are unconstitutional, believing that they "prevent" the right of jury trial at sentencing. However, Page fails to consider two relevant South Dakota statutes that provide for that right. Additionally, even if the right of jury trial is not allowed under the statutes, Page's argument on waiver is not only unsupported, but is refuted by the United States Supreme Court, this Court, and the other State Supreme Courts that have considered this issue.

[¶91.]     Page, by pleading guilty and expressly declining the circuit court's offer to empanel a jury to consider his sentence, waived his right to challenge the jury sentencing scheme. Therefore, even if we read the capital sentencing statutes as failing to specifically mention the right of jury sentencing following a plea; in

fact, even if we read them to explicitly "prevent" such jury sentencing, Page voluntarily waived that right. Waivers are no stranger to our criminal procedure jurisprudence. We will not, without any supporting authority, sanction the remarkable proposition that a defendant may waive the right to a jury at sentencing, allow the trial court to impose a sentence in accordance with the defendant's wishes, and then, to avoid an unfavorable sentence, invalidate the waiver on appeal by arguing a deprivation of the constitutional right that the defendant *did not want to exercise. See Rhoades*, 753 NE2d at 544 (stating that a "[d]efendant should not be able to waive a right, receive a sentence he subjected himself to, and then contend that the right was violated"). This reasoning is illogical. More fundamentally, it is at odds with cases from this Court, the United States Supreme Court, and other state Supreme Courts.

[¶92.] **10.** **Whether Page's death sentence was grossly disproportionate to co-defendant Hoadley's life sentence.**

[¶93.] After a jury sentenced Page's co-defendant Hoadley to life imprisonment, we remanded Page's first appeal to the circuit court for an intra-case proportionality review as articulated by our opinion in *State v. Bonner*, 1998 SD 30, 577 NW2d 575. *See Hoadley*, 2002 SD 109, 651 NW2d 249 (affirming co-defendant Hoadley's life sentence without the possibility of parole). On remand, the circuit court held a hearing and subsequently entered findings of fact and conclusions of law affirming Page's death sentence. Page goes beyond Eighth Amendment proportionality analysis and also addresses our statutory review under SDCL chapter 23A-27A and its interpretative case law in a comparison of the culpability

of himself as compared to Hoadley.  Since both statutory and constitutional reviews

are invoked, we address each.

[¶94.]        This Court's proportionality review as set out in *Bonner*, 1998 SD 30,

577 NW2d 575, is derived from the Eighth Amendment's prohibition against cruel

and unusual punishment.  In this case, Page claims his death sentence was

unconstitutionally imposed because his co-defendant Hoadley received a sentence of

life imprisonment.  As we recognized in *Bonner*:

> [I]f the words "Equal Justice Under Law" call for more than just
> a lofty inscription, then our vigilance ought to be aroused when
> extremely divergent sentences are imposed for the same offense.
> Gross disparity in punishment erodes public confidence in our
> institutions of justice[.]  Of course, equal treatment in
> sentencing does not mean senseless uniformity, *but when a
> sentence is so out of proportion to the offense and so different
> from what others have received for the same conduct, then
> decency and conscious urge us to examine it more closely*.

1998 SD 30, ¶12, 577 NW2d at 578-79 (emphasis added) (internal citation omitted).

Thus, our task is to determine if Page and Hoadley were sentenced for the same

conduct, and if so, whether the divergent sentences imposed upon them resulted in

gross disparity in punishment.

[¶95.]        Since our opinion in *Bonner*, we have employed the following well-

established principles in reviewing the proportionality of a given sentence:

> [T]o assess a challenge to proportionality we first determine
> whether the sentence appears grossly disproportionate.  To
> accomplish this, we consider the conduct involved, and any
> relevant past conduct, with utmost deference to the Legislature
> and the sentencing court.  If these circumstances fail to suggest
> gross disproportionality, our review ends.  If, on the other hand,
> the sentence appears grossly disproportionate, we may, in
> addition to examining the other *Solem* factors, conduct an intra-
> and inter-jurisdictional analysis to aid our comparison or
> remand to the circuit court to conduct such comparison before

> resentencing. We may also consider other relevant factors, such as the effect upon society of this type of offense.

*Id.* ¶17 (citing Harmelin v. Michigan, 501 US 957, 1000, 111 SCt 2680, 2704, 115 LEd2d 836 (1991)).

[¶96.] The Legislature sanctioned capital punishment for murder when at least one aggravating circumstance exists. SDCL 23A-27A-1. In Page's case, the circuit court found five aggravating circumstances.[21] As discussed above, the sentencing judge had ample factual justification for determining those aggravators were present in this case.

[¶97.] In this case, Page pleaded guilty to first degree felony murder, kidnapping, first degree robbery, first degree burglary, and grand theft. Page's first degree murder conviction constituted a Class A felony carrying with it the maximum penalty of death, provided that the procedures outlined in SDCL chapter 23A-27A were followed and met. Page waived his right to sentencing by jury and instead actively sought sentencing by the circuit court. His co-defendant Hoadley pleaded not guilty but was convicted by a jury of the same offenses to which Page pleaded guilty. However unlike Page, Hoadley sought sentencing by a jury. The jury found the same aggravating factors present in Hoadley's case as were found in

---

21. The circuit court found that five aggravating circumstances had been proven beyond a reasonable doubt by the State. Three aggravators were proven under SDCL 23A-27A-1(6), in that the offense included torture, depravity of mind and aggravated battery to the victim. The fourth aggravator was proven under SDCL 23A-27A-1(3), in that circuit court found beyond a reasonable doubt that the offense was committed for the pecuniary benefit of the defendant and co-defendants. The fifth aggravator was proven under 23A-27A-1(9), in that the offense was committed in order to eliminate Poage as a witness.

Page's case:  SDCL 23A-27A-1(3), (6), and (9).  After hearing the relevant evidence in mitigation and aggravation, the jury decided to impose life imprisonment upon Hoadley rather than the death penalty.  For his proportionality argument, Page primarily relies on the fact that Hoadley was convicted of the same crimes to which Page pleaded guilty and the fact that the jury found the same aggravating factors in Hoadley's case as the circuit court determined were present in his case.

[¶98.]     First, we note this Court has consistently held capital punishment is not cruel and unusual in violation of the Eighth Amendment or the South Dakota Constitution.  *Moeller I*, 1996 SD 60, ¶¶96-109, 548 NW2d at 487-489; *Moeller II*, 2000 SD 122, ¶176 n18, 616 NW2d at 465.  We also recognize "death is a different kind of punishment from any other which may be imposed in this country" and that "[t]he penalty of death is qualitatively different from a sentence of imprisonment, however long."  Lankford v. Idaho, 500 US 110, 125, 125 n21, 111 SCt 1723, 1732 n21, 114 LEd2d 173 (1991) (citing Gardner v. Florida*, 430 US 349, 357, 97 SCt 1197, 1204, 51 LEd2d 393 (1977), and Woodson v. North Carolina*, 428 US 280, 305, 96 SCt 2978, 2991, 49 LEd2d 944 (1976)).  This qualitative difference between Page's death sentence and Hoadley's life sentence does not render the sentences *per se* disproportionate.  In order for Page's sentence to be disparate under our *Bonner* analysis, he must first show his and Hoadley's "past records, demeanor, [and] *degree of criminal involvement* ... are sufficiently similar as to cause the sentence disparity between them to be unjust." *See Garber*, 2004 SD 2, ¶32, 674 NW2d at 328 (citing *Bonner*, 1998 SD 30, ¶20, 577 NW2d at 581 (emphasis added)).  Absent such a showing, we will not reverse the circuit court's sentencing decision because

disparate treatment of co-defendants is permissible where one of the defendants is more culpable than a co-defendant. *Id.* ¶33.

[¶99.] It must be noted that although the Supreme Court has addressed cases where one defendant received the death penalty while another did not, it has never held that all co-defendants convicted for the same capital offense must receive the same sentence. *See* Enmund v. Florida, 458 US 782, 102 SCt 3368, 73 LEd2d 1140 (1982); and Tison v. Arizona, 481 US 137, 107 SCt 1676, 95 LEd2d 127 (1987). Research has not revealed any state supreme court that has so held, nor was Page able to cite to such authority in his briefs to this Court. Indeed, the majority of states have explicitly held the opposite after concluding it was constitutionally permissible for one co-defendant to receive the death penalty while another receives a less severe sentence. *See* Gavin v. State, 891 So2d 907 (AlaCrimApp 2003) ("There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence.") (affirming death sentence dismissal of capital charges against co-defendant) (quoting Williams v. State, 461 So2d 834, 839 (AlaCrimApp 1983), *rev'd on other grounds*, 461 So2d 852 (Ala 1984)); Taylor v. State, 808 So2d 1148, 1201 (AlaCrimApp 2000) ("[W]hile our statute obliges us to consider the punishment given any accomplices, it does not require that every defendant involved in a crime receive the same punishment.") (affirming capital sentence despite life sentence of co-defendant) (quoting McNair v. State, 706 So2d 828, 845 (AlaCrimApp 1997)); State v. Taylor, 838 So2d 729, 757 (La 2003) ("As a general rule, the fact a co-defendant has received a more lenient sentence does not necessarily indicate the [death] penalty imposed on defendant is

excessive.") (affirming death sentence even though co-defendant sentenced to life for the same murder in subsequent trial) (citing State v. Day, 414 So2d 349, 352 (La 1982)); State v. Jaynes, 549 SE2d 179, 203 (NC 2001) ("[T]he fact that a defendant is sentenced to death while a co-defendant receives a life sentence for the same crime is not determinative of proportionality.") (affirming capital sentence where co-defendant received sentence of life-imprisonment) (quoting State v. McNeill, 509 SE2d 415, 427 (NC 1998)); State v. Morris, 24 SW3d 788, 800 (Tenn 2000) ("Similarly, that a defendant in a similar case or even the same case has received a sentence less than death does not render a death sentence arbitrary, excessive, or disproportionate.") (citing State v. Cauthern, 967 SW2d 726, 741 (Tenn 1998) (affirming death penalty)).

[¶100.]      These above-cited cases are consistent with the general proposition recognized in the non-capital *Garber* opinion, 2004 SD 2, ¶33, 674 NW2d at 328, that held the level of culpability for an offense is not always the same, even where a defendant has pleaded guilty to the same offense.  Today, we hold this general proposition as applicable to our review of capital sentencing cases as well as non-capital cases.

[¶101.]      The Supreme Court has twice addressed situations where multiple co-defendants were convicted of the same capital offense.  In *Enmund*, 458 US 782, 102 SCt 3368, 73 LEd2d 1140, the Supreme Court reversed the death sentence of a defendant who was present in the getaway car used in an armed robbery that resulted in two murders.  The defendant, Enmund, received the death penalty along

with the co-defendant who actually committed the murders.  The Supreme Court

reversed:

> Because the Florida Supreme Court affirmed the death penalty
> in this case in the absence of proof that Enmund killed or
> attempted to kill, and regardless of whether Enmund intended
> or contemplated that life would be taken, we reverse the
> judgment upholding the death penalty and remand for further
> proceedings not inconsistent with this opinion.

*Id.* at 801, 102 SCt at 3378-79, 73 LEd2d 1140.  Therefore, under *Enmund*, an

accomplice to a felony may not be sentenced to death unless he either killed or

intended a killing to occur:  "For purposes of imposing the death penalty, Enmund's

criminal culpability must be limited to his participation in the robbery, and his

punishment must be tailored to his personal responsibility and moral guilt."  *Id.*  In

sum, a defendant's capital sentence must be based upon his own culpability in a

murder and not upon his co-defendant's actions.

[¶102.]      The Supreme Court clarified its holding in *Tison*, wherein the Court

affirmed the capital sentence of two appellants who had helped two convicted

murderers escape from an Arizona penitentiary.  481 US 137, 107 SCt 1676, 95

LEd2d 127.  During the escape, the appellants watched while the two escaped

convicts murdered a family of four that had pulled over to help the men with a flat

tire.  *Id.* at 141, 107 SCt at 1679, 95 LEd2d 127.  Upholding the death sentences of

the two appellants, the *Tison* Court ruled:

> [W]e hold that the reckless disregard for human life implicit in
> knowingly engaging in criminal activities known to carry a
> grave risk of death represents a highly culpable mental state, a
> mental state that may be taken into account in making a capital
> sentencing judgment when that conduct causes its natural,
> though also not inevitable, lethal result.

481 US at 157-58, 107 SCt at 1688, 95 LEd2d 127. This holding was based on the Court's reasoning that the *Enmund* culpability requirement may be established through "major participation in the felony committed, combined with reckless indifference to human life." *Id.* Thus, under *Enmund* and *Tison*, a defendant's death sentence must be rooted in his own culpability for the capital offense, as demonstrated by his actual killing, intent or knowledge that killing would occur, or through major participation in a crime involving reckless indifference to human life.

[¶103.] Accordingly, in reviewing situations where multiple defendants were involved in the commission of a capital offense, state courts have focused upon the relative culpability of the particular defendant. The Florida Supreme Court has stated that "[u]nderlying our relative culpability analysis is the principle that equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment." Shere v. Moore, 830 So2d 56, 60 (Fla 2002) (citations omitted). However, "[w]here co-perpetrators are not equally culpable, the death sentence of the more culpable defendant is not disproportionate where the other receives a life sentence." Caballero v. State, 851 So2d 655, 663 (Fla 2003) (citing Jennings v. State, 718 So2d 144, 153 (Fla 1998)). Generally, in determining the relative culpability of an appellant, state courts seek to distinguish between those co-defendants who were "active participants" in the crime from those who were only "passive participants." People v. Caballero, 794 NE2d 251, 269-71 (Ill 2002) ("[E]vidence that defendant was a follower, rather than a leader, in the commission of the crime has been held to be a significant factor in the analysis of disparate sentences.") (citing People v. Jackson, 582 NE2d 125 (Ill 1991) (citing People v.

Gleckler, 411 NE2d 849 (Ill1980))). *Accord* Kormondy v. State, 845 So2d 41, 47-48 (Fla 2003) (upholding capital sentence where defendant was the "dominant force in the killing" and the "triggerman"); Marquard v. State, 850 So2d 417, 424 (Fla 2002) (affirming death penalty where facts tended to show the defendant was the "dominant person in this entire course of events" including driving the group to a secluded area and ordering another co-defendant to stab the victim); *Taylor*, 838 So2d at 757 (recognizing that capital sentences are "invariably returned by juries when defendant was the shooter"); Simmons v. State, 869 So2d 995, 1007-08 (Miss 2004) (upholding death penalty where defendant "actively planned and participated" in a robbery and murder even though he was not the leader, planner, or instigator of the killing); *Cauthern*, 967 SW2d at 741 (affirming capital sentence where defendant could be characterized as "the leader in the perpetration of this crime; he knew the victims and planned the offenses"); State v. Lafferty, 20 P3d 342, 375 (Utah 2001) (death sentence upheld where defendant was the "principle actor" who had "masterminded the scheme" that resulted in the deaths); Harlow v. State, 70 P3d 179, 203-04 (Wyo 2003) (utilizing the language of *Tison* in upholding the death sentence for a defendant who was a "major participant in a murder" and "acted with reckless indifference to human life").

[¶104.]     Having determined that the proportionality of co-defendants' disparate sentences should be grounded in the difference in their relative culpability for the crime, we must address the nature of the evidence upon which this determination may be based. In *Lafferty*, 20 P3d at 375, the Supreme Court of Utah spoke in terms of "ample" evidence and "clear weight of the evidence" in determining that

the defendant's culpability in the crime was not disproportionate to his death sentence. In *Cauthern*, the Tennessee Supreme Court detailed the facts of the case and concluded that "sufficient evidence" existed on which to base disparate sentences of co-defendants convicted of the same felony. 967 SW2d at 741. In a recent opinion, the Court of Criminal Appeals of Alabama upheld a defendant's capital sentence conviction based largely upon the testimony of one of his accomplices. *Gavin*, 891 So2d at 975-77. In that case, the court found the accomplice's testimony to be "sufficiently corroborated" by the evidence in the case. *Id.*

[¶105.] With these recent decisions in mind, it appears that most state supreme courts are deferential to the facts as established by the finder of fact, whether it be a jury or trial court. According to the Florida Supreme Court, "a trial court's determination concerning the relative culpability of the co-perpetrators in a first-degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence." *Marquard*, 850 So2d at 424 (quoting Puccio v. State, 701 So2d 858, 860 (Fla 1997)).

[¶106.] SDCL 23A-27A-10 provides that this Court shall render its decision based on "the factual substantiation of the verdict, and the validity of the sentence." Although chapter 23A-27A is not specific as to the appropriate standard of review of proportionality in death penalty cases, statutes seem to contemplate a heightened review by this Court. We agree with the Arizona Supreme Court in *Arizona v. Watson*, 628 P2d 943, 946 (Ariz 1981), when it observed:

> The question before us is not whether the trial court properly imposed the death penalty, but whether, based upon the record

before us, we believe that the death penalty should be imposed. A finding merely that the imposition of the death penalty by the trial court was "factually supported" or "justified by the evidence" is not the separate and independent judgment by this court that the death penalty warrants. This is in keeping with the mandate of the United States Supreme Court that we must review carefully and with consistency death penalty cases and not engage in "cursory" or "rubber stamp" type of review.

(citing Proffitt v. Florida, 428 US 242, 96 SCt 2960, 49 LEd2d 913 (1976)).

[¶107.] Nevertheless the trial court remains the finder of fact as this Court does not resolve conflicts in evidence, pass on credibility of the evidence, or weigh the evidence in a court trial any more than it does in a jury case. State v. Romero, 269 NW2d 791 (SD 1978). Having no witnesses appear before us, we are unable to resolve conflicts in the evidence, pass on witness credibility, or weigh evidence. State v. Burtzlaff, 493 NW2d 1, 4-5 (SD 1992).

[¶108.] In sum, the Supreme Court's opinions in *Enmund* and *Tison* require this Court to focus upon the relative culpability of each co-defendant in the commission of the capital offense. *See Enmund*, 458 US 782, 102 SCt 3368, 73LEd2d 1140; *Tison*, 481 US 137, 107 SCt 1676, 95 LEd2d 127. In gauging the culpability of each defendant, this Court will first seek to ascertain whether or not the defendant actively participated in the crime or crimes and whether the defendant either intended to murder the victim or acted with reckless disregard for human life. The purpose of this inquiry is to distinguish the more passive accomplices from those who were more active in committing the capital offense. In order to make this distinction, this Court will focus upon the relative actions and roles exhibited by the defendants. Jurisprudence from other jurisdictions strongly suggests that factors such as leadership in the crime or having been the

"triggerman" are relevant and should be established by substantial, competent evidence. *See supra* ¶103.

[¶109.] The statements of Piper, Page and Hoadley are not all consistent as between themselves. A review of the record shows that the three perpetrators' individual behavior is distinguishable. Although there are certainly conflicts among each defendant's self-serving statements, Piper's and Page's admitted facts disclose a common thread revealing that Hoadley was less culpable than Piper and Page. Therefore, even discounting Hoadley's self-serving versions of the incident, and only considering Page's own statements, this voluminous record contains significant evidence establishing the absence of gross disproportionality between the sentences.

[¶110.] This Court will only consider Page's own statements concerning his actions and his differentiations between his acts and those of Hoadley as against the statements of Piper and Hoadley. The circuit court indicated on the record it did the same.[22] We do so because Piper, Page and Hoadley never testified under oath and were never subject to cross-examination. Page's statement given at the time of arrest, sought to minimize his individual involvement to some extent and place the bulk of the blame for the planning and execution of this crime on Piper.

---

22. The circuit court addressed Page at his sentencing hearing, noting:
    Today you need not be concerned by the statements of Briley Piper or that he would blame you or you would be held accountable for things he says that you did. I've relied on your statements to officers, as well as the forensic evidence and other evidence in the case. I have not referred to or relied on the statements of co-defendants in determining your level of participation in this case.

Nevertheless, this does not require this Court to accept at face value all the evidence and inferences brought forward by Page. *See* State v. Anderberg, 89 SD 75, 80, 228 NW2d 631, 634 (1975).

[¶111.] After an extensive review of the record, we conclude that there were genuine and substantial differences between the actions of Page and Hoadley, which made Page more morally culpable for the violence and torture inflicted upon Poage. First, the evidence and Page's own admission show Page was the most violent of the three murderers. Page was the only one of the three to use a firearm.

[¶112.] Additionally, Page confirmed a critical portion of Hoadley's version of the facts. Page never alleged that Hoadley was involved in planning or initiating the events that led to the murder and robbery of Poage. Page admitted that he instigated the crime by pulling the gun out, telling Poage they were going to "jack" him, and forcing him to the floor. While admitting that he and Piper hit the victim in the face, Page denied Hoadleys participation. Significantly like Piper, Page's description of the initiation of this tragedy fails to even mention Hoadley, other than the fact that he was in another room playing Play Station.

[¶113.] Finally, it is highly significant that in describing the details at the creek, Page tended to put more of the blame on Piper, just as Piper had done in his interview with respect to Page. Although there was a claim by Page that Hoadley also kicked Poage at Higgins Gulch, there was no evidence that either Hoadley or Piper kicked the victim as many times and with as much force as Page. Hoadley did not claim any injury to his foot from the force or the number of kicks to Poage's head, that "injury" was only sustained by Page despite the fact he was wearing

heavy boots. Perhaps most telling of all, when Poage attempted to escape his attackers at Higgins Gulch, it was Page who chased him down and forced him back into the icy creek. Once again, Poage's attempt at escape was blocked by Page. Nor does the record show that Hoadley engaged in the torture of Poage to the extent exhibited by Page. Page and Piper discussed the various ways of killing the victim directly in front of a conscious Poage, including slitting his throat. Page "chuckled" during Poage's torture, seemingly amused at the extreme amount of pain the victim was experiencing. After giving the victim false hope he would be allowed to warm himself in his vehicle, it was Page who told Poage they were "liars" and then kicked the victim in the face.

[¶114.]     Poage especially drew the wrath of Page when Poage failed to cooperate in his attempted drowning in the creek by Page:

> I put my foot on his head, but I couldn't stand there. It was like too slippery because he was too far into the creek. And I had to stand on rocks, so I couldn't keep my balance. ... So I put my foot on his head, but I couldn't keep my balance because he kept on moving so I just was like fuck it, I'm not falling in the creek.

In addition, the record strongly suggests Page was the planner and initiator of much of the violence inflicted upon Poage. In contrast, none of the group members identified Hoadley as the planner or instigator of the attack. Page began the ordeal by pointing a pistol at Poage, a pistol he had previously stolen from the victim's house. Page and Piper rendered the victim helpless by tying him up with a cord, an idea first expressed by Page. Page engaged in a discussion concerning how the group would murder Poage. Both at the house and at the gulch, Page prevented Poage's escape or opportunity to escape. By his own admission, Page was the first to stab the victim. In fact, when the other two assailants first expressed reluctance

about stabbing Poage, Page apparently had little qualms, saying "Fuck it, I'll do it." Page also admitted to a psychologist, Dr. Mark Perrenoud, that Page did the most physical damage to Poage of any of the three defendants.[23] After finally murdering Poage, it was Page who received the victim's vehicle, the most valuable of the property stolen by the group.

[¶115.] Subsequent to listening to Page's explicit description of the above events, the DCI Agent asked, "What would have justified that?" Rather than responding with any type of remorse over the anguish suffered by Poage, Page casually responded, "He never done any wrong to us.  I mean he was always nice. He just tried to be our friend and stuff." Page's only emotion was that he personally felt better after the interview as it was good to get it off his chest.

[¶116.] In the final analysis, the record reflects that Page often tended to minimize his culpability by blaming Piper, but Page never alleged Hoadley was the leader, planner, or the major participant in the execution of this tragic incident.  If one actually examines the record, the difference in culpability between Page and Hoadley is evident.  This difference in culpability permits the imposition of different sentences for joint actors involved in the commission of the same offense.  As the circuit court noted, Page was no follower in the commission of this crime.  At Page's sentencing, the judge remarked, "There may have been a follower out there that day, but it wasn't you.  You and Piper were two of a kind."

---

23. Dr. Perrenoud also concluded Page was sane at the time of the killing and of average intelligence.

[¶117.]    The circuit court found as fact that Hoadley was remorseful for his actions and we have no reason to conclude to the contrary. Page gave a statement of remorse to the circuit court and the Poage family just prior to his sentencing.[24] In contrast to this statement, outside the courtroom during this period of time, Page seemed to relish discussing the murder and made threats against other prisoners and guards.[25] Had Hoadley been absent that fateful day, there is nothing in the record to indicate that the torture/murder of Poage would not have taken place anyway. Piper and Page jointly planned and initiated it. On the other hand, if

---

24.    Page stated just prior to his sentencing:

> I know I'm the last—I'm one of the last people you would want to hear from, but please let me say this to you. It may not mean anything to you, but I feel I owe at least this one thing. This is very hard for me, but I will do the best I can. Here it goes: I am sorry for what I did. I wish I could explain how sorry I am. I know that doesn't make up for what I did. I also know that nothing I do will make up for what I did. I don't expect you to forgive me; God knows I wouldn't forgive me. I'm sure you would like an explanation of why I did what I did. I can't speak for the other two, but for myself, personally, I cannot give you an answer to that question because I honestly don't know why I did it. I know that I did was wrong. I feel like the biggest piece of shit for it, and I hope I get what I deserve. I don't know what else to say. I don't expect you ever to forgive me, but I just want you to know that my apology is here. And please don't hate my family and friends for what I did. If you hate anybody, hate me.

25.    At the sentencing hearing Page's cellmate, Eric Ollila, testified that he was Page's cellmate for seven days and that Page talked about the details of the murder each day. Page also talked daily to the other twelve prisoners in that cellblock about the crime. Page spoke of the details in a nonchalant or matter-of-fact manner with no emotion or regrets. During these numerous conversations, Page also failed to show any remorse or sympathy for Poage's family. Page's only concern was for himself and that he hoped he would not get the death penalty. When Page suspected that Ollila had been interviewed by the DCI about these conversations, Page threatened Ollila.

Page had not been present that day, there is no evidence to indicate that Hoadley would have planned and executed the murder, especially in the brutal manner in which it was committed. Moreover, Poage's few opportunities at escape were blocked by Page with no assistance from Hoadley. As the circuit court noted just prior to passing sentence:

> By your own admission, the kidnapping and killing of Allan took maybe two hours or more. You had lots of chances to change your mind and back out. Had you dropped the gun on the floor and headed out the door and ran down the street, I doubt if Piper would have chased you down. I doubt if he would have gone through with the plan, knowing that a key witness was now on the loose. You had chances to spare Allan's life.

Nor has Page's indifference to committing murder and other felonious acts of violence apparently been abated. He remains a threat to prison guards, especially female ones,[26] and anyone who would have the potential to come into contact with him.

[¶118.]     Hoadley had a terrible upbringing. Unfortunately so did Page. The circuit court noted this at sentencing when it observed "[y]our early years must have been a living hell. Most people treat their pets better than your parents treated their kids." Page was in and out juvenile institutions that in the end unfortunately did not solve his inability to properly live in society. By the time he arrived in Spearfish, Page was active in the illegal drug and criminal cultures. While he initially came to Spearfish to live with members of a church that took him into their home and provided him with a job in an attempt to break his downward

---

26.     While in jail after the killing, Page wrote in a letter that he threatened to sodomize a female jail guard and also wrote "I hope she reads this."

cycle of life, Page's circumstances and behaviors soon changed for the worse. While some of the previous individual criminal claims involving Page are subject to evidentiary question, his overall personality traits are not.[27]

[¶119.]    We observed in *Rhines I*: "[A] death sentence should not be invalidated simply because a jury determined that another defendant, who committed an analogous crime, deserved mercy. Proportionality review focuses not only on the crime, but also on the defendant." 1996 SD 55, ¶206, 548 NW2d at 457 (citing SDCL 23A-27A-12(3); State v. Benn, 845 P2d 289, 317 (Wash1993) (holding "[s]imply comparing numbers of victims or other aggravating factors may

---

27.    The circuit court entered the following findings of fact on Page's background:

> 37. Defendant Page has a long history of involvement with the court systems, and he has lived in a series of foster homes and juvenile detention centers as a result of his burglaries, car thefts and anti-social behavior. Defendant Page has been placed in a series of juvenile detention facilities that have designed programs to benefit him. Defendant Page has consistently run away from these facilities and programs.
>
> 38. As early as March 1997, psychologists and psychiatrists noted that Defendant Page was exhibiting sociopathic traits. These traits included, uncontrollable aggression, lack of remorse and an absence of conscience. Defendant Page has a long history of not taking responsibility for his actions and anger control.
>
> 39. The Ozanam Boys Home in the State of Missouri found Defendant Page had made absolutely no progress while in their treatment facility, and that he exhibited no commitment whatsoever in any type of change in his antisocial behaviors. He repeatedly ran away from their facility, he was defiant, and alienated to all forms of discipline. He showed no ability to take responsibility for his behavior and blamed other people for his situation.

superficially make two cases appear similar, where in fact there are mitigating circumstances in one case to explain either a jury's verdict not to impose the death penalty or a prosecutor's decision not to seek it.") (quoting State v. Lord, 822 P2d 177, 223 (Wash 1991), *cert. denied*, 510 US 944, 114 SCt 382, 126 LEd2d 331 (1993)).  The record shows Page's conduct and general culpability for the murder of Poage, including the particularly heinous aggravating circumstances, was not the same as Hoadley's.  Therefore, under our analysis as set forth in *Bonner*, the circumstances of Page's case do not suggest gross disproportionality in light of Hoadley's sentence.

[¶120.]      Affirmed.

[¶121.]      KONENKAMP and ZINTER, Justices, concur.

[¶122.]      SABERS and MEIERHENRY, Justices, dissent.


SABERS, Justice (dissenting).

[¶123.]      I respectfully dissent.  South Dakota's capital sentencing scheme prevents a defendant who pleads guilty from having the alleged aggravating circumstances found by a jury.  The scheme is therefore unconstitutional under *Apprendi, Ring* and *Blakely* and the majority opinion violates canons of statutory construction by ignoring statutory language to come to the conclusion that the sentencing procedure is constitutional.  I also dissent from the majority opinion's conclusion that Piper and Page's sentences were not disproportionate in comparison to their co-defendant, Hoadley.  We should reverse and remand for re-sentencing to life in prison without the possibility of parole.

**[¶124.]**      **1.**      **South Dakota's capital sentencing scheme in nonjury trials violates the Sixth Amendment right to a jury trial as incorporated to the states through the Fourteenth Amendment.**

**[¶125.]**      *Apprendi v. New Jersey* held:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

530 US 466, 490, 120 SCt 2348, 2362, 147 LEd2d 435.

**[¶126.]**      In *Ring v. Arizona*, the Court applied its holding in *Apprendi* to hold that a capital defendant's Sixth Amendment rights were violated when the judge "imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding." Blakely v. Washington, 542 US 296, 303-04, 124 SCt 2531, 2537, 159 LEd2d 403 (2004) (citing *Ring*, 536 US at 603-609, 122 SCt 2428, 153 LEd2d 556). Specifically, under Arizona's capital sentencing scheme, once the jury found a defendant guilty of first-degree murder, the judge was required to "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated aggravating] circumstances ... for the purpose of determining the sentence to be imposed." The judge was required to make all of the factual findings regarding the question whether there were any aggravating circumstances. The Court wrote:

> Based solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment. [] This was so because, in Arizona, a "death sentence may not legally be imposed ... unless at least one aggravating factor is found to exist beyond a reasonable doubt." [] The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial

> guarantee, [] made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury. []

*Ring,* 536 US at 597, 122 SCt at 2437, 153 LEd2d 556). The Court held that the aggravating factor determination had to be entrusted to the jury in order to preserve defendants' Sixth Amendment rights. *Id.*

[¶127.] In *Blakely v. Washington,* the defendant pleaded guilty to kidnapping his wife. 542 US at 298, 124 SCt at 2534, 159 LEd2d 403. The facts supporting his guilty plea made him eligible for a maximum sentence of 53 months. *Id.* at 299, 124 SCt at 2535, 159 LEd2d 403. The Court sentenced him to 90 months after making a finding that he acted with "deliberate cruelty." *Id.* The trial court received the authority to enhance the sentence from the Washington criminal code, which provided that a trial court was entitled to impose a sentence above the standard range if it found "substantial and compelling reasons justifying an exceptional sentence." *Id.* at 299, 124 SCt at 2535, 159 LEd2d 403. The United States Supreme Court overturned the sentence, relying on *Ring* and *Apprendi,* stating:

> Our precedents make clear [] that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. See Ring,* at 602, 122 SCt 2428 ("'the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" (quoting *Apprendi, supra,* at 483, 120 SCt 2348)); *Harris v. United States,* 536 US 545, 563, 122 SCt 2406, 153 LEd2d 524 (2002) (plurality opinion) (same); *cf. Apprendi, supra,* at 488, 120 SCt 2348 (facts admitted by the defendant). In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the

> punishment," *Bishop, supra,* § 87, at 55, and the judge exceeds
> his proper authority.

*Id.* at 542 US 303-304, 124 SCt at 2537, 159 LEd2d 403 (emphasis in original).

This line of cases makes clear that absent a valid knowing and voluntary waiver of the Sixth Amendment right to a jury trial, a judge may only sentence based on "the facts reflected in the jury verdict or admitted by the defendant." In other words, in a capital case, absent valid waiver, the defendant has a right to have a jury determine the facts regarding whether there are aggravating circumstances. Allowing the court to impose the death penalty based on facts not admitted by the defendant or found by the jury is a violation of the defendant's Sixth Amendment right to a jury trial.

[¶128.] Turning to South Dakota's capital sentencing scheme, one can see that the plain language of the statute dealing with nonjury trials violates the clear principles enunciated in *Apprendi, Ring* and *Blakely*.

[¶129.] SDCL 23A-27A-2 provides:

> In all cases in which the death penalty may be imposed and *which are tried by a jury*, upon a return of a verdict of guilty *by the jury*, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment. At such hearing *the jury shall receive all relevant evidence,* including:
> > (1) Evidence supporting any of the aggravating circumstances listed under § 23A-27A-1;
> > (2) Testimony regarding the impact of the crime on the victim's family;
> > (3) Any prior criminal or juvenile record of the defendant and such information about the defendant's characteristics, the defendant's financial condition, and the circumstances of the defendant's behavior as may be helpful in imposing sentence;

(4) All evidence concerning any mitigating circumstances.

(emphasis added).

[¶130.]     SDCL 23A-27A-6 provides:

In nonjury cases *the judge shall*, after conducting the presentence hearing as provided in § 23A-27A-2*, designate, in writing, the aggravating circumstance or circumstances, if any, which he found beyond a reasonable doubt.* Unless at least one of the statutory aggravating circumstances enumerated in § 23A-27A-1 is so found, the death penalty shall not be imposed.

(emphasis added).

[¶131.]     The majority opinion concludes that there is no "statutory impediment preventing a defendant who pleads guilty … from exercising his right to a jury at the penalty phase." *Supra ¶*71. However, to come to this conclusion, it is necessary to ignore pivotal language in the pertinent statutes. First, SDCL 23A-27A-2 provides for a sentencing hearing before a jury: "[i]n all cases in which the death penalty may be imposed and *which are tried by a jury*[.]*"* (emphasis added). The jury hearing on aggravating circumstances is clearly inapplicable in nonjury cases. This interpretation is supported by the fact that the Legislature provided a different statute and procedure for sentencing in nonjury cases under SDCL 23A-27A-6. SDCL 23A-27A-6 unequivocally requires the *judge* to make the factual findings regarding aggravating circumstances in nonjury cases. *See* SDCL 23A-27A-6 (providing in part, "[i]n non-jury cases *the judge shall* [] designate, in writing, the aggravating circumstance or circumstances, if any, *which he found* beyond a reasonable doubt").

[¶132.]     The majority opinion relies solely on the phrase, "presentence hearing as provided in § 23A-27A-2*"* to support its determination that a jury hearing is

permitted by the statute.  This reliance is appropriate only if the Court chooses to wholly ignore the plain language surrounding that phrase and the plain language of SDCL 23A-27A-2.  That language makes clear that the Legislature intended that the court, not a jury, hear the evidence and make written findings regarding aggravating circumstances in nonjury cases.  This is in direct contravention of the Supreme Court's holding in *Apprendi,* which this Court acknowledged in *State v. Hoadley,* that:

> it is unconstitutional for a [state] legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.

*Apprendi,* 530 US at 490, 120 SCt at 2363, 147 LEd2d 435; *Hoadley*, 2002 SD 109, ¶32, 651 NW2d 249, 257.

[¶133.]     I acknowledge and embrace the canon of statutory construction requiring this Court, whenever possible, to construe statutes so as to not violate the constitution.  *See* majority opinion ¶73.  However, that canon of statutory construction cannot be used by the Court to simply ignore the operative language of two statutes in order to find them constitutional.  This is especially so when the Court is considering statutes dealing with the most severe penalty under the law. We should not broaden our rules of construction to the point of absurdity in an effort to drive to a desired result.  Instead, we should carefully consider the plain language of the statutes and follow our constitutional duty to strike down those statutes which violate our citizens' rights.

[¶134.]     Lacking any statutory support for its conclusions, the majority opinion goes on to hold that the defendants waived their constitutional right to have a jury

determine whether they would receive death or life in prison. This conclusion is based on the erroneous premise that the "circuit court properly presented Page [and Piper] with the option of exercising [the] right to sentencing by a jury as provided by South Dakota's capital punishment statutory scheme." There is no such right for defendants who plead guilty to capital crimes under the sentencing scheme. Therefore, this holding has no anchor in the law. As Page notes, "the waiver of a substantive right presupposes the existence of the right in the first place. The language of the statute expressly limits the fact-finding role to the judge in non-jury cases ... the judge ... had no authority to offer jury sentencing once [the defendants] pleaded guilty." That the circuit court made an illusory offer of jury sentencing is no justification for upholding an unconstitutionally imposed death sentence. Therefore, under these circumstances, the aggravating factors had to be admitted by the defendant or found by a jury, not the judge, and the penalty of death was unconstitutionally imposed.

[¶135.] The United States Supreme Court could not have been more clear on this issue than when it stated that the right to a jury determination of the facts essential to imposition of sentencing:

> is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the peoples' ultimate control in the legislative and executive branches, jury trial is meant to ensure their control of the judiciary.

*Blakely,* 542 US at 306, 124 SCt at 2538-39, 159 LEd2d 403. The defendants' unconstitutionally imposed sentences should be reversed and the cases remanded for re-sentencing in accordance with SDCL 23A-27A-14.

#21864

[¶136.]     In foresight, the South Dakota State Legislature has specifically provided the appropriate remedy.

[¶137.]     SDCL 23A-27A-14 provides:

> In the event the death penalty for a Class A felony is held to be unconstitutional by the South Dakota Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a Class A felony shall have such person brought before the court, and the court shall sentence such person to life imprisonment.

[¶138.]     **2.      Piper and Page's death sentences were grossly disproportionate in comparison to Hoadley's life sentence.**[28]

[¶139.]     Based primarily on untested, un-cross-examined and self-serving statements by Hoadley, Piper and Page, the circuit court and the majority opinion comes to the conclusion that Piper and Page were more culpable and less remorseful than Hoadley, and therefore more deserving of death.  In a stunning reversal from its argument in the Hoadley case, the State now argues that Hoadley is less culpable in this horrendous crime than Piper and Page.  The majority opinion relies on the tenuous reasoning that Hoadley did not confess to being as violent or proactive as Piper and Page.  Hoadley's penchant for self-preservation is a shifting foundation that is utterly insufficient to support the gross disparity in sentencing of death for Piper and Page, and life for Hoadley.  We should

---

28.     Because the factors for consideration in all three cases (Piper, Page, and Hoadley) are exactly the same and the facts substantially similar, I respectfully submit the same writing, analysis and arguments in the Piper and Page cases.

reverse the circuit court's determination that the sentences were not grossly

disproportionate.

[¶140.]     Sifting through thousands of pages of trial transcripts, defendant

statements, and investigative reports, one could write reams detailing the atrocities

committed by Hoadley, Piper and Page.  In the end, their individual behavior is so

despicable as to be indistinguishable.  Yet, the circuit court and the majority

opinion parse selected facts, microanalyzing the events of the night to determine

whether Piper and Page were worse than Hoadley.

[¶141.]     The problem with this analysis is that it places this Court and

the circuit court in a position of picking and choosing which untested facts to believe

and then using those facts to sentence one defendant to a life sentence and two

others to death.[29]  Certainly, this type of fact finding is always done in determining

---

29.     This problem is exacerbated by the circuit court's performance on remand.
        For example, in Page's case, the circuit court did not engage in true
        comparative analysis of the actions of Hoadley and Page.  Instead, the circuit
        court appears to have sifted through the record and reiterated all of the facts
        it could find in favor of its original sentence.  The findings of fact and
        conclusions of law do not compare the culpability of Page and Hoadley, they
        merely restate facts regarding Page's culpability.  The majority opinion
        supports this improper analysis by giving deference to those findings.
        However, without any significant findings with regard to Hoadley's actions
        before, during, and after the murder, it cannot be said that "Hoadley's 'past
        records, demeanor, [and] degree of criminal involvement'" are dissimilar
        enough to warrant such disparity in sentencing.

        In fact, the majority opinion ignores those facts that show Hoadley's conduct
        to be equal or more heinous than that of Piper and Page.  It does so despite
        the fact that the Hoadley trial and sentencing transcripts are part of the
        record in this appeal.  Those transcripts show that Hoadley (1) wiped up the
        blood in the kitchen after the initial assault; (2) stabbed Poage in the throat;
        (3) stood on the back of Poage's head in an attempt to drown him; (4) dropped
        two massive rocks on Poage's head; (5) kept property used in the murder as
                                                        (continued . . .)

whether there are sufficient aggravating factors to warrant imposition of the death sentence.  However, the fact finders in all of these cases have already determined that the defendants had the same aggravating factors.  Yet only one received mercy.  All of the defendants have been found guilty of the same crimes, yet two will be put to death for those crimes.  This is not a case where one defendant acted as a lookout or drove the getaway car.  As the State consistently argued below, all three defendants actively engaged in the crimes that occurred on the evening Poage was murdered.

[¶142.]     In fact, the State charged Hoadley, Piper and Page with identical acts, conduct and charges, all resulting in identical convictions.  The same aggravating factors were alleged and found against all three: Hoadley, Piper and Page.  There are no meaningful differences to justify life for Hoadley and death for Piper and Page.  The real substantial difference was that the jury gave life to Hoadley, and the judge gave death to Piper and Page.

[¶143.]     I respectfully submit all three, Hoadley, Piper and Page, should receive life in prison without the possibility of parole for their substantially identical acts of murder.  *See* SDCL 23A-27A-14, *supra* ¶137.

[¶144.]     MEIERHENRY, Justice, joins this dissent.

---

(. . . continued)
> souvenirs, including the dog leash used to bind Poage; (6) when a friend asked him about the murder, Hoadley replied, "shit happens, dude;" and (7) showed pictures of himself wearing Poage's clothes to his cellmates.